# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE No.: | 2020AP1419-OA, 2020AP1420-OA, 2020AP1446-OA |

COMPLETE TITLE:

Sara Lindsey James,
      Petitioner,
   v.
Janel Heinrich, in her capacity as Public Health
Officer
of Madison and Dane County,
      Respondent.

------------------------------------------------

Wisconsin Council of Religious and Independent
Schools, School Choice Wisconsin Action,
Abundant Life Christian School, High Point
Christian School, Lighthouse Christian
School, Peace Lutheran School, Westside
Christian School, Craig Barrett, Sarah Barrett,
Erin Haroldson, Kent Haroldson, Kimberly
Harrison, Sheri Holzman, Andrew Holzman, Myriah
Medina, Laura Steinhauer, Alan Steinhauer,
Jennifer Stempski, Bryant Stempski, Christopher
Truitt and Holly Truitt,
      Petitioners,
   v.
Janel Heinrich in her official capacity as
Public Health Officer and Director of Public
Health of Madison and Dane County and Public
Health of Madison and Dane County,
      Respondents.

------------------------------------------------

St. Ambrose Academy, Inc., Angela Hineline,
Jeffery Heller, Elizabeth Idzi, James Carrano,
Laura McBain, Sarah Gonnering, St. Maria Goretti
Congregation, Nora Statsick, St. Peter's
Congregation, Anne Kruchten, Blessed Sacrament
Congregation, Amy Childs, Blessed Trinity
Congregation, Columbia/Dane County, WI Inc.,
Loretta Hellenbrand, Immaculate Heart of Mary
Congregation, Lorianne Aubut, St. Francis
Xavier's Congregation, Mary Scott, Saint Dennis
Congregation and Ruth Weigel-Sterr,
      Petitioners,
   v.

Joseph T. Parisi, In his Official Capacity as
County Executive of Dane County and Janel
Heinrich, In her Official Capacity as Director,
Public Health, Madison &
Dane County,
                 Respondents.

―――――――――――――――――――――――――――――――――――――――

ORIGINAL ACTION

―――――――――――――――――――――――――――――――――――――――

| | |
|---|---|
| OPINION FILED: | June 11, 2021 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | December 8, 2020 |

SOURCE OF APPEAL:
   COURT:
   COUNTY:
   JUDGE:

JUSTICES:
REBECCA GRASSL BRADLEY, J., delivered the majority opinion of
the Court, in which ZIEGLER, C.J., and ROGGENSACK, J., joined;
and in which HAGEDORN joined except for footnote 18. HAGEDORN,
J., filed a concurring opinion. DALLET, J., filed a dissenting
opinion in which ANN WALSH BRADLEY and KAROFSKY, JJ., joined.
NOT PARTICIPATING:

ATTORNEYS:

     For the petitioners, there was an opening brief filed by
*Richard M. Esenberg, Anthony LoCoco, Lucas T. Vebber, Luke N. Berg,
Elisabeth Sobic* and *Wisconsin Institute for Law & Liberty*,
Milwaukee; with whom on the brief was *Misha Tseytlin, Kevin M.
LeRoy, Troutman Pepper*, and *Hamilton Sanders LLP*, Chicago,
Illinois; with whom on the brief was *Andrew M. Bath* and *Thomas
More Society*, Chicago, Illinois; with whom on the brief was *Erick
Kaardal* and Mohrman, *Kaardal & Erickson, P.A.*, Minneapolis,
Minnesota; with whom on the brief was *Joseph W. Voiland* and
*Veterans Liberty Law*, Cedarburg; with whom on the brief was *Brent
Eisberner* and *Levine Eisberner LLC*, Madison; with whom on the brief
was *Bernardo Cueto*, Onalaska. There was an oral argument by *Richard
M. Esenberg, Misha Tseytlin, and Joseph W. Voiland*.

For the respondent, there was a brief filed by *Remzy D. Bitar, Sadie R. Zurfluh*, and *Municipal and Litigation Group*, Waukesha. There was an oral argument by *Remzy D. Bitar*.

For the petitioners Wisconsin Council of Religious and Independent Schools, et al., there was a reply brief filed by *Richard M. Esenberg, Anthony LoCoco, Luke N. Berg, Elisabeth Sobic,* and *Wisconsin Institute for Law & Liberty*, Milwaukee.

For the petitioners St. Ambrose Academy, Inc. et al., there was a reply brief filed by *Misha Tseytlin, Kevin M. LeRoy,* and *Troutman Pepper Hamilton Sanders LLP*, Chicago, Illinois; with whom on the brief was *Andrew M. Bath* and *Thomas More Society*, Chicago, Illinois; with whom on the brief was *Erick Kaardal* and *Mohrman, Kaaradal & Erickson, P.A.*, Minneapolis, Minnesota.

An amicus curiae brief was filed on behalf of Attorney General Josh Kaul by *Colin A. Hector*, assistant attorney general, and *Colin T. Roth*, assistant attorney general; with whom on the brief was *Joshua L. Kaul*, attorney general.

An amicus curiae brief was filed on behalf of Institute for Justice by *Lee U. McGrath*, Minneapolis, Minnesota; with whom on the brief was *Milad Emam*, Arlington, Virginia.

An amicus curiae brief was filed on behalf of Freedom from Religion Foundation by *Brendan Johnson, Patrick C. Elliott,* and *Freedom From Religion Foundation, Inc.*, Madison.

An amicus curiae brief was filed on behalf of State Superintendent of Public Instruction Carolyn Stanford Taylor and Wisconsin Department of Public Instruction by *Heather Curnutt*, Madison.

An amicus curiae brief was filed on behalf of City of Milwaukee by *Tearman Spencer,* city attorney*, and Gregory P. Kruse*, city attorney.

An amicus curiae brief was filed on behalf of Madison Metropolitan School District and Monona Grove School District by *Sheila M. Sullivan*, *Melita M. Mullen*, and *Bell, Moore & Richter, S.C.*, Madison.

An amicus curiae brief was filed on behalf of Madison Teachers Inc., Wisconsin Association of Local Health Departments and Boards, Wisconsin Education Association Council, Milwaukee Teachers' Education Association, Racine Educators United, Kenosha Education Association, and Green Bay Education Association by *Diane M. Welsh*, *Aaron G. Dumas*, and *Pines Bach LLP*, Madison.

An amicus curiae brief was filed on behalf of Governor Tony Evers and Secretary-Designee of Department of Health Services Andrea Palm by *Sopen B. Shah* and *Perkins Coie LLP*, Madison.

An amicus curiae brief was filed on behalf of Wisconsin Faith Voices for Justice by *Barry J. Blonien, Tanner Jean-Louis*, and *Boardman & Clark LLP*, Madison.

An amicus curiae brief was filed on behalf of Liberty Justice Center, Alaska Policy Forum, Pelican Institute For Public Policy, Roughrider Policy Center, Nevada Policy Research Institute, and Rio Grande Foundation by *Daniel R. Suhr, Reilly Stephens,* and *Liberty Justice Center*, Chicago, Illinois.

An amicus curiae brief was filed on behalf of League of Wisconsin Municipalities by *Claire Silverman* and *Maria Davis*, Madison.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

Nos.  2020AP1419-OA & 2020AP1420-OA & 2020AP1446-OA

STATE OF WISCONSIN          :          IN SUPREME COURT

Sara Lindsey James,

       Petitioner,

    v.

Janel Heinrich, in her capacity as Public
Health Officer of Madison and Dane County,

       Respondent.

**FILED**

**JUN 11, 2021**

Sheila T. Reiff
Clerk of Supreme Court

Wisconsin Council of Religious and Independent
Schools, School Choice Wisconsin Action,
Abundant Life Christian School, High Point
Christian School, Lighthouse Christian School,
Peace Lutheran School, Westside Christian
School, Craig Barrett, Sarah Barrett, Erin
Haroldson, Kent Haroldson, Kimberly Harrison,
Sheri Holzman, Andrew Holzman, Myriah Medina,
Laura Steinhauer, Alan Steinhauer, Jennifer
Stempski, Bryant Stempski, Christopher Truitt
and Holly Truitt,

       Petitioners,

    v.

Janel Heinrich in her official capacity as
Public Health Officer and Director of Public
Health of Madison and Dane County and Public
Health of Madison and Dane County,

       Respondents.

**St. Ambrose Academy, Inc., Angela Hineline, Jeffery Heller, Elizabeth Idzi, James Carrano, Laura McBain, Sarah Gonnering, St. Maria Goretti Congregation, Nora Statsick, St. Peter's Congregation, Anne Kruchten, Blessed Sacrament Congregation, Amy Childs, Blessed Trinity Congregation, Columbia/Dane County, WI Inc., Loretta Hellenbrand, Immaculate Heart of Mary Congregation, Lorianne Aubut, St. Francis Xavier's Congregation, Mary Scott, Saint Dennis Congregation and Ruth Weigel-Sterr,**

        **Petitioners,**

    **v.**

**Joseph T. Parisi, In his Official Capacity as County Executive of Dane County and Janel Heinrich, In her Official Capacity as Director, Public Health, Madison & Dane County,**

        **Respondents.**

---

REBECCA GRASSL BRADLEY, J., delivered the majority opinion of the Court, in which ZIEGLER, C.J., and ROGGENSACK, J., joined; and in which HAGEDORN joined except for footnote 18. HAGEDORN, J., filed a concurring opinion. DALLET, J., filed a dissenting opinion in which ANN WALSH BRADLEY and KAROFSKY, JJ., joined.

---

ORIGINAL ACTION. *Rights declared; order vacated.*

¶1 REBECCA GRASSL BRADLEY, J. Exercising our original jurisdiction under Article VII, Section 3(2) of the Wisconsin Constitution,[1] we consolidate and review three cases challenging

---

[1] Article VII, Section 3(2) of the Wisconsin Constitution provides: "The supreme court has appellate jurisdiction over all courts and may hear original actions and proceedings. The supreme court may issue all writs necessary in aid of its jurisdiction."

the authority of Janel Heinrich, in her capacity as a local health officer of Public Health of Madison and Dane County (PHMDC), to issue an emergency order closing all schools in Dane County for in-person instruction in grades 3-12. Citing Wis. Stat. § 252.03 (2017-18)[2] as authority, Heinrich issued Emergency Order #9 ("the Order") in an effort to decrease the spread of a novel strain of coronavirus, COVID-19. The Petitioners[3] contend that the Order exceeds Heinrich's statutory authority under § 252.03 and violates their fundamental right to the free exercise of religion under Article I, Section 18 of the Wisconsin Constitution, as well as parents' fundamental right to direct the upbringing and education of their children under Article I, Section 1 of the Wisconsin Constitution.

¶2 In response, Heinrich asserts that local health officers have the statutory authority under Wis. Stat. § 252.03 to issue school-closure orders. Further, she argues that the Order is constitutional under the United States Supreme Court's ruling in Jacobson v. Massachusetts, 197 U.S. 11 (1905), and that, even if Jacobson does not apply, the Order does not violate the Wisconsin Constitution.

¶3 We agree with the Petitioners and hold: (1) local health officers do not have the statutory power to close schools under

---

[2] All subsequent references to the Wisconsin Statutes are to the 2017-18 version unless otherwise indicated.

[3] The Petitioners include Sara Lindsey James, Wisconsin Council of Religious and Independent Schools (WCRIS), St. Ambrose Academy, parents of students in Dane County schools, and several other schools and membership associations.

Wis. Stat. § 252.03; and (2) Heinrich's Order infringes the Petitioners' fundamental right to the free exercise of religion guaranteed under Article I, Section 18 of the Wisconsin Constitution, which Jacobson cannot override. Accordingly, those portions of the Order restricting or prohibiting in-person instruction are unlawful, unenforceable, and are hereby vacated.

I. BACKGROUND

¶4 In February 2020, Dane County authorities confirmed the first diagnosis of an individual with COVID-19 in Wisconsin.[4] The number of cases throughout the state soon began to rise. On March 12, 2020, Governor Tony Evers declared a public health emergency in Wisconsin. The next day, then Secretary-Designee of the Department of Health Services (DHS), Andrea Palm, issued an order mandating "the closure of all public and private Wisconsin schools for purposes of [in-person] instruction and extracurricular activities."

¶5 On March 24, 2020, Palm issued a statewide "Safer at Home Order." Among other dictates, this order required all people in the state to remain in their homes, prohibited non-essential travel, closed all "non-essential" businesses, and——as relevant to this case——closed "[p]ublic and private K-12 schools . . . for [in-person] instruction and extracurricular activities." On April

---

[4] COVID-19 is an acute respiratory syndrome spread through close contact with a contagious individual. Center for Disease Control, Coronavirus Disease 2019 (COVID-19): 2020 Interim Case Definition (Apr. 5, 2020), https://wwwn.cdc.gov/nndss/conditions/coronavirus-disease-2019-covid-19/case-definition/2020/.

4

16, 2020, Palm extended the "Safer at Home Order" for another month. Palm's new order mandated that schools remain closed for in-person instruction "for the remainder of the 2019-20 school year."

¶6 In Wisconsin Legislature v. Palm, we invalidated many of the mandates in Palm's extension of the "Safer at Home Order," declaring that the "Safer at Home Order" was unenforceable because it "was subject to statutory emergency rulemaking procedures established by the Legislature." 2020 WI 42, ¶3, 391 Wis. 2d 497, 942 N.W.2d 900. However, this court did not address Palm's mandate closing schools for in-person instruction. Id., ¶3 n.6. Accordingly, schools throughout Wisconsin finished their instruction for the 2019-20 school year on virtual platforms pursuant to the statewide "Safer at Home Order."

¶7 Following this court's decision in Palm, PHMDC and its local health officer, Janel Heinrich, began issuing a series of emergency orders governing Dane County. Many of these orders regulated COVID-19 safety protocols in public and private schools throughout the county. As they relate to schools, Heinrich's emergency orders were as follows:

1. On May 13, 2020, Heinrich issued Emergency Order #1, which "adopted the provisions" contained in the "Safer at Home Order," including the mandate closing schools.

2. On May 18, 2020, Heinrich issued Emergency Order #2, which expressly reiterated that public and private K-12 schools must stay closed for in-person instruction, but allowed them to provide "[d]istance learning or virtual learning."

The order also stated that higher education institutions may remain open only "for purposes of facilitating distance learning, performing critical research, or performing essential functions."

3. On May 22, 2020 and June 5, 2020, Heinrich issued Emergency Orders #3 and #4, respectively. These orders, among other edicts, maintained the closure of K-12 schools, but allowed higher education institutions to "determine policies and practices for safe operations" and to open dormitories with "strict policies that ensure safe living conditions."

4. On June 15, 2020, Heinrich issued Emergency Order #5, which re-opened K-12 schools for "pupil instruction and extracurricular activities" effective July 1, 2020. The order also stated that, in order to re-open, schools must, inter alia, "[d]evelop and implement a written hygiene policy and procedure . . . [and] a written action plan for a COVID-19 outbreak at the school."

5. On July 7, 2020, Heinrich issued Emergency Order #8. This order, in anticipation of schools starting the school year with in-person instruction, outlined a series of safety protocols. The order stated, among other things, that "[i]ndividual groups or classrooms cannot contain more than fifteen (15) students if the students are age 12 or under . . . [or] more than twenty-five (25) students if age 13 or older." The order also stated that schools must "[d]evelop and implement a written protective measure policy and procedure that includes . . . [e]nsuring

6

students are at least six (6) feet from other students[,] [e]nsuring employees are provided with and wear face coverings[,] [and] [e]nsuring that student and staff groupings are as static as possible[.]"

In reliance on Emergency Orders #5 and #8, some schools in Dane County opened for in-person instruction (or were preparing to open for in-person instruction), including the petitioner schools.

¶8 However, on August 21, 2020, three days before the start of the 2020-21 school year for many schools, Heinrich released Emergency Order #9, which closed all public and private schools for in-person instruction for students in grades 3-12.[5] The Order exempted students in grades K-2, so long as the schools provided an alternative virtual learning option.[6] The Order further stated that, even though in-person instruction was prohibited for students in grades 3-12, schools could continue to operate in person as "child care and youth settings." As a rationale for the mandate, the Order explained that "[t]his remains a critical time for Dane County to decrease the spread of COVID-19, keep people healthy, and maintain a level of transmission that is manageable by health care and public systems." The Order acknowledged that a "number of systematic reviews have found that school-aged children contract COVID at lower rates than older populations" and

---

[5] In relevant part, the Order stated: "Public and private school buildings and grounds are open for in-person student instruction for grades kindergarten through second (K-2) only."

[6] On September 1, 2020, Heinrich amended the Order to also allow in-person instruction for any qualifying students with disabilities.

7

that "[o]utbreaks and clusters among cases aged 5-17 have been rare."  Heinrich cited Wis. Stat. § 252.03(1), (2), and (4) as authority for issuing the Order.

¶9  Although in-person instruction was forbidden for grades 3-12, the Order allowed all higher education institutions to remain open for in-person instruction, allowing them "to determine policies and practices for safe operation" and to keep open their student dormitories so long as they continue to enact "strict policies that ensure safe living conditions."  The Order further allowed many businesses to conduct in-person operations, including bars, salons, barber shops, gyms, fitness centers, water parks, pools, bowling alleys, and movie theatres, subject to various capacity limitations and social-distancing guidelines.

¶10  One day after Heinrich issued the Order, Sara Lindsey James, a parent of two students enrolled in Our Redeemer Lutheran School in the City of Madison, filed a petition for original action in this court challenging the lawfulness of the Order.  James enrolled her children in Our Redeemer Lutheran School because of her sincerely-held religious belief that it is essential for her children to receive a faith-based education.  Our Redeemer Lutheran was one of the schools the Order required to cease in-person instruction.  James believes that it is critical for her children's education to take place "in-person" and "together with others as part of the body of Christ."

¶11  Other petitions for original action soon followed. Wisconsin Council of Religious and Independent Schools (WCRIS), a membership-based association of religious and independent

8

schools,[7] filed a petition for original action with this court challenging the lawfulness of the Order.  WCRIS represents over 600 schools throughout Wisconsin, including 23 schools in Dane County serving approximately 4,600 students in grades K-12.  Like James, parents associated with WCRIS hold sincerely-held beliefs that in-person religious education is vital to their children's religious formation.

¶12  Additionally, St. Ambrose Academy, a classical Catholic school located in the City of Madison, together with parents of children attending St. Ambrose,[8] brought a petition for original action to this court challenging the lawfulness of the Order. According to St. Ambrose, its "religious mission depends on in-person attendance to be fully realized."  St. Ambrose offers its students the opportunity to receive Holy Communion at weekly Masses, frequent confessions before a Catholic priest, Adoration of the Eucharist, communal prayer throughout the day, and opportunities to go on retreats and service missions throughout the local area.  The Order prohibited these in-person activities.

¶13  All three petitions for original action raised the same two claims:  (1) the Order exceeded Heinrich's statutory authority under Wis. Stat. § 252.03, and (2) the Order violated the

---

[7] WRCIS's petition for original action was joined by a group of parents of students attending Dane County schools, as well as several other membership associations and individual schools themselves.

[8] Other religious schools and parents of children attending these schools joined St. Ambrose's petition for original action.

Petitioners' fundamental right to the free exercise of religion under Article I, Section 18 of the Wisconsin Constitution.[9] The Petitioners also requested temporary injunctive relief. Heinrich filed a response opposing the petitions for original action.

¶14 On September 10, 2020, this court granted the three petitions for original action and consolidated them for purposes of briefing and oral argument. At the same time, this court enjoined those provisions of the Order "which purport to prohibit schools throughout Dane County from providing in-person instruction to students," thereby allowing schools to re-open for in-person instruction. In issuing the injunction, this court determined that Petitioners: (1) had a reasonable probability of success on the merits, (2) lacked an adequate remedy at law, and (3) would suffer irreparable harm in the absence of an injunction. Recognizing that "[o]verriding the choices of parents and schools, who also undoubtedly care about the health and safety of their teachers and families, intrudes upon the freedoms ordinarily retained by the people under our constitutional design," we

---

[9] The Petitioners also contend that the Order violates Petitioners' fundamental right to direct the education and upbringing of their children under Article I, Section 1 of the Wisconsin Constitution. The Petitioners' principal constitutional claim, however, focused on the free exercise of religion and was more substantively developed than Petitioners' parental rights argument. Because we resolve the constitutional challenge under the free exercise of religion provision, we decline to address the Petitioners' additional constitutional argument.

10

concluded that a balancing of equities favored issuing the injunction. On December 8, 2020, we heard oral argument.[10]

## II. STANDARD OF REVIEW

¶15 We review this case under our original jurisdiction conferred in Article VII, Section 3(2) of the Wisconsin Constitution. The Petitioners ask this court to interpret Wis. Stat. § 252.03 in determining whether Heinrich violated her

---

[10] After oral argument, Heinrich issued another emergency order, which does not mandate school closures; Heinrich asserts her subsequent order renders this case moot. Even if Heinrich's latest order moots this original action, many of the recognized exceptions to the mootness doctrine apply. "[E]xceptions to dismissal for mootness include situations involving: (1) issues of great public importance; (2) the constitutionality of a statute; (3) issues that arise so often a definitive decision is essential to guide the trial courts; (4) issues likely to arise again and that should be resolved by the court to avoid uncertainty; or (5) issues . . . capable and likely of repetition and yet evade review[.]" Portage Cnty. v. J.W.K., 2019 WI 54, ¶29, 386 Wis. 2d 672, 927 N.W.2d 509 (quoted source omitted). Given the ever-evolving orders from PHMDC, the issues presented are undoubtedly capable and likely of repetition but would evade review if every time a lawsuit challenging PHMDC's orders is filed, the health authority issues a modified order. Additionally, the statutory and constitutional issues in this case plainly present matters of great public importance. Accordingly, we address the merits of this dispute. See Roman Catholic Diocese of Brooklyn v. Cuomo, 141 S. Ct. 63, 72 (2020) (Gorsuch, J., concurring) ("[J]ust as this Court was preparing to act . . . the Governor loosened his restrictions, all while continuing to assert the power to tighten them again anytime as conditions warrant. So if we dismissed this case, nothing would prevent the Governor from reinstating the challenged restrictions tomorrow. And by the time a new challenge might work its way to us, he could just change them again. The Governor has fought this case at every step of the way. To turn away religious leaders bringing meritorious claims just because the Governor decided to hit the 'off' switch in the shadow of our review would be, in my view, just another sacrifice of fundamental rights in the name of judicial modesty.").

statutory authority.  Issues of statutory interpretation and application present questions of law.  Police Ass'n v. City of Milwaukee, 2018 WI 86, ¶17, 383 Wis. 2d 247, 914 N.W.2d 597.  The Petitioners also ask this court to interpret Article I, Section 18 of the Wisconsin Constitution.  Issues of constitutional interpretation also are questions of law.  Serv. Emps. Int'l Union, Loc. 1 v. Vos, 2020 WI 67, ¶28, 393 Wis. 2d 38, 946 N.W.2d 35.

### III.  DISCUSSION

#### A.  Statutory Powers Under Wis. Stat. § 252.03

¶16  The Petitioners argue that Heinrich lacks authority under Wis. Stat. § 252.03 to close schools.  Heinrich responds that both Wis. Stat. § 252.03(1) and (2) authorize local health officers to issue school-closure orders.  The Petitioners are correct.  Section 252.03 does not provide local health officials with any authority to close schools; accordingly, Heinrich's Order is statutorily unlawful.[11]

¶17  Wisconsin Stat. § 252.03 delineates the powers of local health officers regarding communicable diseases.  Subsections (1) and (2) of the statute provide:

> (1)  Every local health officer, upon the appearance of any communicable disease in his or her territory, shall immediately investigate all the circumstances and make a full report to the appropriate governing body and also to the department.  The local health officer shall promptly take all measures necessary to prevent, suppress and control communicable

---

[11] Both parties stipulated to the fact that the Order "closes schools," despite the availability of virtual learning options for students.  Accordingly, we do not further address whether the Order constitutes a "school-closure order."

12

diseases, and shall report to the appropriate governing body the progress of the communicable diseases and the measures used against them, as needed to keep the appropriate governing body fully informed, or at such intervals as the secretary may direct. The local health officer may inspect schools and other public buildings within his or her jurisdiction as needed to determine whether the buildings are kept in a sanitary condition.

(2) Local health officers may do what is reasonable and necessary for the prevention and suppression of disease; may forbid public gatherings when deemed necessary to control outbreaks or epidemics and shall advise the department of measures taken.

¶18 Nowhere in this statute did the legislature give local health officers the power to "close schools." The statute lists a series of discrete powers afforded local health officers in order to address communicable diseases. Local health officers may, for example, "forbid gatherings when deemed necessary to control outbreaks or epidemics," and "inspect schools and other public buildings . . . as needed to determine whether the buildings are kept in a sanity condition." Wis. Stat. § 252.03(1) and (2). Under the doctrine of expressio unius est exclusio alterius, the "express mention of one matter excludes other similar matters [that are] not mentioned." FAS, LLC v. Town of Bass Lake, 2007 WI 73, ¶27, 301 Wis. 2d 321, 733 N.W.2d 287 (quoting Perra v. Menomonee Mut. Ins. Co., 2000 WI App 215, ¶12, 239 Wis.2d 26, 619 N.W.2d 123); see also State v. Delaney, 2003 WI 9, ¶22, 259 Wis. 2d 77, 658 N.W.2d 416; Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 107-11 (2012) ("The expression of one thing implies the exclusion of others (expressio unius est exclusio alterius)."). Pursuant to this doctrine, if

13

"the legislature did not specifically confer a power," the exercise of that power is not authorized. State ex rel. Harris v. Larson, 64 Wis. 2d 521, 527, 219 N.W.2d 335 (1974). Because the legislature expressly granted local health officers discrete powers under Wis. Stat. § 252.03 but omitted the power to close schools, local health officers do not possess that power. See Jefferson v. Dane Cnty., 2020 WI 90, ¶29, 394 Wis. 2d 602, 951 N.W.2d 556.

¶19 Heinrich's contrary interpretation of Wis. Stat. § 252.03 makes little sense when read in conjunction with Wis. Stat. § 252.02, a closely-related statute governing the powers of DHS regarding communicable diseases. In § 252.02, the legislature specifically stated that "[t]he department [of health services] may close schools and forbid public gatherings in schools, churches, and other places to control outbreaks and epidemics." § 252.02(3) (emphasis added). The presence of this specific text in § 252.02 in the face of its conspicuous absence from § 252.03 shows that the legislature withheld that authority from local health officers. Given that § 252.02 and § 252.03 mirror each other in other substantive respects, this stark difference supports our textual analysis. Under the related-statutes canon of statutory construction, statutes in the same chapter "contain[ing] the same subject matter . . . must be considered in pari materia and construed together." State v. Wachsmuth, 73 Wis. 2d 318, 325, 243 N.W.2d 410 (1976); see also State v. Jensen, 2000 WI 84, ¶20, 236 Wis. 2d 521, 613 N.W.2d 170; R.W.S. v. State, 162 Wis. 2d 862, 871, 471 N.W.2d 16 (1991). "Several acts in pari

14

materia, and relating to the same subject, are to be taken together, and compared in the construction of them, because they are considered as having one object in view, and as acting upon one system." Scalia & Garner, supra, at 252 (quoting 1 James Kent, Commentaries on American Law 433 (1826)).

¶20 Comparing the construction of these two statutes, located in the same chapter and covering the same subject matter, confirms that the legislature withheld this authority from local health officers. See State ex rel. Kalal v. Cir. Ct. for Dane Cnty., 2004 WI 58, ¶46, 271 Wis. 2d 633, 681 N.W.2d 110 ("[S]tatutory language is interpreted in the context in which it is used; not in isolation but as part of a whole; in relation to the language of surrounding or closely-related statutes."). As we explained when we granted temporary injunctive relief, this conclusion is bolstered by the fact that "[b]oth Wis. Stat. § 252.02 and Wis. Stat. § 252.03 were drafted at the same time and by the same legislature, so no historical quirk or later amendment . . . would suggest anything other than the legislature granted DHS and local health officers different powers."

¶21 Despite the absence of any express grant of authority allowing local health officers to close schools, Heinrich argues that her general authority to take measures "reasonable and necessary" for the prevention and suppression of disease allows her to close schools. See Wis. Stat. § 252.03(2). She is incorrect. If local health officers' authority to take measures "reasonable and necessary" included the extraordinary power to close schools, then the legislature's specification of particular

15

powers, such as the power to "inspect schools," would be superfluous. The power to take measures "reasonable and necessary" cannot be reasonably read as an open-ended grant of authority. Doing so would swallow the rest of the statute and render it mere surplusage. "Statutory language is read where possible to give reasonable effect to every word, in order to avoid surplusage." Kalal, 271 Wis. 2d 633, ¶46; see also Scalia & Garner, supra, at 174.

¶22 Furthermore, Heinrich's interpretation of local health officers' "reasonable and necessary" powers violates the fundamental principle that specific statutory language controls over more general language. See In re Paternity of Palmersheim, 2004 WI App 126, ¶27, 275 Wis. 2d 311, 685 N.W.2d 546; Apple Valley Gardens Ass'n, Inc. v. MacHutta, 2007 WI App 270, ¶16, 306 Wis. 2d 780, 743 N.W.2d 48. If Heinrich's argument were correct, then the general provision would essentially afford local health officers any powers necessary to limit the spread of communicable diseases. This cannot be. What is reasonable and necessary cannot be reasonably read to encompass anything and everything. Nothing in the text of the statute confers upon local health officers the power to close schools. To conclude otherwise would be tantamount to striking language from the statute so that it says only "[l]ocal health officers may do what is reasonable and necessary for the prevention and suppression of disease." Because we are a court and not the legislature, it would exceed the constitutional boundaries of our authority to rewrite the law in this manner.

16

¶23 As recognized since the founding of our nation, "it is no more the court's function to revise by subtraction than by addition[.] As Chief Justice John Marshall explained: 'It would be dangerous in the extreme, to infer from extrinsic circumstances, that a case for which the words of an instrument expressly provide, shall be exempted from its operation.' Or in the words of Thomas M. Cooley: '[T]he courts must . . . lean in favor of a construction which will render every word operative, rather than one which may make some idle and nugatory.'" Scalia & Garner, supra, at 174 (quoting Sturges v. Crowninshield, 17 U.S. (4 Wheat.) 122, 202 (1819) (per Marshall, C.J.) and Thomas M. Cooley, A Treatise on the Constitutional Limitations Which Rest upon the Legislative Power of the States of the American Union 58 (1868)). Adopting Heinrich's statutory analysis (as the dissent does) would render the rest of Wis. Stat. § 252.03 entirely redundant. If "[l]ocal health officers may do what is reasonable and necessary for the prevention and suppression of disease" then the legislature quite unnecessarily wrote that "[t]he local health officer may inspect schools and other public buildings within his or her jurisdiction as needed to determine whether the buildings are kept in a sanitary condition." § 252.03(1). Under Heinrich's (and the dissent's) statutory construction, the legislature also needlessly wrote that local health officers "may forbid public gatherings when deemed necessary to control outbreaks or epidemics." § 252.03(2). Heinrich's (and the dissent's) interpretation of § 252.03 violates the "cardinal rule of statutory interpretation that no provision should be construed to be entirely redundant."

17

Kungys v. United States, 485 U.S. 759, 778 (1988) (citations omitted).[12]

---

[12] Justice Rebecca Dallet would apparently jettison the canons of statutory construction that have guided judicial interpretation for centuries. While the canons represent "a generally agreed-on approach to the interpretation of legal texts" judges who reject this textually-grounded method of decision making "refuse to yield the ancient judicial prerogative of making the law, improvising on the text to produce what they deem socially desirable results[.]" Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts xxvii, 4 (2012). Justice Dallet disparages these canons because they interfere with her desired results. In her dissent to the court's order granting injunctive relief, Justice Dallet criticized the court (and the petitioners) for "fail[ing] to understand that we are all in this together; voluntarily sending children to school may put others in the community at risk." Contrary to Justice Dallet's policy-focused approach, the canons serve as "helpful, neutral guides" and are "grounded in experience developed by reason and tend to a better administration of justice than leaving interpretation in each case to feelings of policy on the part of the tribunal." Scalia & Garner, supra, at 61 (quoting 3 Roscoe Pound, Jurisprudence 506 (1959)).

Justice Antonin Scalia and Bryan Garner, co-authors of the "first modern attempt . . . to collect and arrange only the valid canons and to show how and why they apply to proper legal interpretation," Scalia & Garner, supra, at 9, included in their treatise only those venerable canons representing "what the best legal thinkers have said for centuries." Id. at xxix. Justice Dallet dismisses their work as just one "toolbox" that is "not the law" but merely an "extrinsic source" (while citing a plethora of secondary sources herself) and ignores the fact that every canon on which the court relies in this opinion has been previously adopted and applied not only by this court, but both federal and state courts——for centuries. Dissent, ¶76. Rejecting longstanding precedent, Justice Dallet would cabin the use of canons solely for "clearing up confusing or ambiguous text." Id., ¶77. Fundamentally, Justice Dallet misunderstands how to interpret legal texts. "[N]either written words nor the sounds that the written words represent have any inherent meaning. Nothing but conventions and contexts cause a symbol or sound to convey a particular idea." Scalia & Garner, supra, at xxvii. The canons represent "a generally agreed-on approach to the interpretation of legal texts." Id. Justice Dallet's marginalization of their role flies in the face of centuries of jurisprudence and her proffered method of statutory interpretation falls on the fringes of acceptable approaches, far outside of the judicial mainstream. "[L]egislators enact; judges interpret" and the canons simply "explain how [judges] should perform this task." Id. at xxx.

Justice Dallet distorts the words of textualists to support her rejection of the fair reading method of statutory interpretation; neither Justice Samuel Alito nor Justice Brett Kavanaugh condemned the entire corpus of canons as Justice Dallet insinuates. Justice Alito did not deride the use of canons of statutory construction, only the Court's abuse of them to defeat "the sense of the matter." Facebook, Inc. v. Duguid, 141 S. Ct. 1163, 1174 (2021) (Alito, J., concurring). Nor did Justice Kavanaugh characterize "Scalia and Garner's brand of textualism" as being "just as subjective as any other" approach. Dissent, ¶79. Justice Kavanaugh never said "fancy-sounding canons . . . warrant little weight in modern statutory interpretation," id.; rather, he targeted his criticisms toward particular canons: "I would consider tossing the ejusdem generis canon into the pile of fancy-sounding canons that warrant little weight in modern statutory interpretation." Brett M. Kavanaugh, Fixing Statutory Interpretation, 129 Harv. L. Rev. 2118, 2161 (2016) (book review). He also never said the canons "often lead to 'wrongheaded' judicial 'policymaking,'" dissent, ¶79; rather, Justice Kavanaugh characterized only "[t]he anti-redundancy canon" which "tells us to bend the statute to avoid redundancies" as "little more than policymaking and, in my view, often quite wrongheaded." Kavanaugh, supra, at 2162.

Citing Justice Scalia extensively (and only favorably), Justice Kavanaugh heartily endorsed the widely accepted canons of construction:

> To assist the interpretive process, judges over time have devised many semantic and substantive canons of construction — what we might refer to collectively as the interpretive rules of the road. To make judges more neutral and impartial in statutory interpretation cases, we should carefully examine the interpretive rules of the road and try to settle as many of them in advance as we can.

Id. at 2121. Acknowledging that "statutory interpretation has improved dramatically over the last generation, thanks to the extraordinary influence of Justice Scalia," Justice Kavanaugh proposed that "courts should seek the best reading of the statute by interpreting the words of the statute, taking account of the context of the whole statute, and applying the agreed-upon semantic canons." Id. at 2118, 2121. Justice Dallet ignores not only the

¶24 Perhaps recognizing the textual shortcomings of her argument, Heinrich points to other statutes that make reference to local health officers closing schools, arguing that these statutes support a local health officer's power to close schools under Wis. Stat. § 252.03. In particular, Heinrich mentions Wis. Stat. § 115.01(10)(b), which says that "school days" are "days on which school is actually taught and the following days on which is not taught: . . . [d]ays on which school is closed by order of a local health officer." Heinrich's reliance on this statute is misplaced. A plain textual reading of § 115.01(10)(b) shows that the provision is not a grant of authority to local health officers; instead, it is merely a "classifications" section for statutes wholly unrelated to the duties of local health officers regarding communicable diseases. Accordingly, this statute has no bearing on the authority of state actors in this case.

¶25 Heinrich further argues that Wis. Stat. § 120.12(27)(a) contemplates that local health officers have the power to close schools under Wis. Stat. § 252.03. Section 120.12(27)(a) states that "[the school board shall] [w]ithin 24 hours of a school being closed for a reason specified in § 115.01(10)(b) or (c) or by the department of health services under § 252.02(3), notify the department." Nothing in this provision gives local health officers any authority to close schools. Rather, the statute contemplates that DHS has the power to close schools under ch. 252. Section

---

canons but the text, context, and structure of Wis. Stat. § 252.03 to reach her desired outcome in this case.

120.12(27)(a) is silent concerning <u>local</u> health officers. Instead, Wis. Stat. § 120.12 pertains to the duties of local school boards. When interpreting the "duties of local health officers" during the presence of "communicable diseases," this court must turn to the plain text of the statute that governs these duties: § 252.03.[13] That statute withholds the power to close schools from local health officers.[14]

B. Legislative and Statutory History of Wis. Stat. § 252.03

¶26 The plain text of Wis. Stat. § 252.03 confers no authority on local health officers to close schools; accordingly,

---

[13] Adopting Heinrich's arguments, Justice Dallet cites statutory provisions referencing school closures by local health officers as proof of their authority under Wis. Stat. § 252.03 to close schools. This is a plain logical fallacy. Like § 252.03, none of these other statutes confer such authority on local health officers. Statutory references to a school closure by a local health officer may stem from Wis. Stat. § 250.042(1), which says: "If the governor declares a state of emergency related to public health under s. 323.10 and designates the department [of health services] as the lead state agency to respond to that emergency, the department shall act as the public health authority during the state of emergency . . . . During the period of the state of emergency, the secretary may designate a local health department as an agent of the department and confer upon the local health department, acting under that agency, the powers and duties of the public health authority." That statutory provision is not challenged in this case so we do not construe it or consider its validity under the constitution; nevertheless, on its face it explains the existence of statutory references to school closures by order of local health officers although no statute confers such authority.

[14] Heinrich points to a few additional statutes from unrelated chapters to support her conclusion that local health officers have the power to close schools under Wis. Stat. § 252.03. Heinrich fails to flesh out these other provisions in any substantive way; accordingly, we decline to discuss them.

22

our analysis of the statute could end there. Kalal, 271 Wis. 2d 633, ¶45 ("[S]tatutory interpretation 'begins with the language of the statute. If the meaning of the statute is plain, we ordinarily stop the inquiry.'"). However, "legislative history is sometimes consulted to confirm or verify a plain-meaning interpretation." Id., ¶51. Similarly, "statutory history" may also be used as part of "plain meaning analysis." See Richards v. Badger Mut. Ins. Co., 2008 WI 52, ¶22, 309 Wis. 2d 541, 749 N.W.2d 581. In this case, both the legislative and statutory history confirm that local health officers do not have the power to close schools. Although the legislature at one point contemplated giving them this power, it never did so.

¶27 Wisconsin's public health infrastructure originated 145 years ago in 1876, when the legislature created the State Board of Health, which, like DHS today, served as the statewide public health agency. Steven Burg, Wisconsin and the Great Spanish Flu Epidemic of 1918, Wisconsin Magazine of History, Autumn 2000, at 44.[15] At that time, the legislature gave the State Board of Health the power to issue statewide health orders in times of crisis. Id. In 1883, the legislature required every town, village, and city in the state to establish a local board of health and appoint a local health officer. Id. In delineating the duties of local health officers, the legislature mandated that local

---

[15] This article is available at https://content.wisconsinhistory.org/digital/collection/wmh/id/43606.

health officers "take such measures for the prevention, suppression, and control of the diseases."[16]  § 1, ch. 167, Laws of 1883.  Nowhere in this law (or in any other) did the legislature give local health officers the power to close schools.

¶28  Thirty years later, in 1913, the legislature enacted a law giving the State Board of Heath the power to close schools during an epidemic.  In contrast, the legislature declined to grant such authority to local health officers.  As relevant to this case, the statute conferred four powers on the State Board of Health:

1. The power "to establish quarantine . . . ";

2. The power "to order and execute what is reasonable and necessary for the prevention and suppression of diseases";

3. The power "to close schools and churches"; and

4. The power "to forbid public gatherings."

§ 1, ch. 674, Laws of 1913 (emphasis added).  Only five years later, when the Spanish Flu infected Wisconsinites, the State Board of Health invoked these extraordinary powers.  Burg, supra, at 45.

¶29  In the aftermath of the Spanish Flu, the legislature revisited Wisconsin's public heath laws.  In May 1919, the

---

[16] In more detail, the 1883 law read: "[I]t shall be the duty of such health officer at all times promptly to take such measures for the prevention, suppression and control of the diseases herein named as may in his judgment be needful and proper, subject to the approval of the board of which he is a member . . . ."  § 1, ch. 167, Laws of 1883.

legislature expanded the powers of local health officers to include the following:

1. The power "to establish quarantine . . . ";

2. The power "to order and execute what is reasonable and necessary for the prevention and suppression of disease";[17] and

3. The power "to forbid public gatherings."

§ 1, ch. 159, Laws of 1919.  This language mirrors the powers accorded the State Board of Health—with one notable exception: the power to close schools.  Compare § 1, ch. 674, Laws of 1913 with § 1, ch. 159, Laws of 1919.

¶30  This legislative choice was no accident.  Early drafts of the bill reveal that the legislature at one point contemplated giving local health officers the power to close schools.  At the time the legislature asked the Attorney General to opine on its constitutionality, an earlier version stated that "the local board of health of each township, incorporated village or city, shall have the power to close schools, theatres, and churches" for the prevention and suppression of disease.  8 Wis. Op. Att'y Gen. 157, 157-58 (1919) (emphasis added).  The Attorney General responded that the provision in the bill "'clos[ing] schools, theatres, and churches' seems to be without limitation."  Id.  Expressing concern over the language's constitutionality, the Attorney General recommended that the language "should . . . more clearly state[]"

_____

[17] The legislature first gave this power to local health officers under its 1883 law.

25

that the "[the provision closing schools] is intended to limit this [authority] to the necessity of controlling epidemics." Id. After receiving the Attorney General's opinion, the legislature struck the provision concerning school closures. Gone was any language allowing local health officers to "close schools" during an epidemic——or otherwise. Ultimately, the legislature enacted this bill without any mention of school closures. See § 1, ch. 159, Laws of 1919.

¶31 The 1919 law established the foundation for Wisconsin's current statute concerning local health officers, with periodic amendments over the ensuing decades. In 1923, the legislature restructured its public health laws, retaining the same language adopted in 1919. See Wis. Stat. §§ 143.02 and 143.03 (1923-24). In 1981, the legislature again amended these laws, with only minor additions. See 1981 Wis. Act 291, §§ 21, 23. In all this time, the legislature never gave local health officers the power to "close schools"——only the statewide health agency (now DHS). Both the plain text of Wis. Stat. § 252.03 as well as its legislative and statutory history lead to only one reasonable conclusion: Heinrich exceeded her statutory authority under Wis. Stat. § 252.03 when she issued the Order closing all schools in Dane County.

## C.  Constitutional Claims[18]

_____

[18] In espousing the doctrine of constitutional avoidance as a compulsory rule, Justice Dallet proclaims that "we generally reach constitutional claims only if the case is 'incapable of resolution without deciding the constitutional conflict,'" misciting Gabler v. Crime Victims Rights Bd., 2017 WI 67, ¶¶51-52, 376 Wis. 2d 147, 897 N.W.2d 384.  Dissent, ¶85.  Gabler actually said:  "This case is incapable of resolution without deciding the constitutional conflict presented by the Board's exercise of its statutory powers."  Gabler, 376 Wis. 2d 147, ¶51.  Although "[t]his court does not normally decide constitutional questions if the case can be resolved on other grounds" such "[c]onstitutional avoidance is 'a matter of judicial prudence' and does not apply where the constitutionality of a statute is 'essential to the determination of the case.'"  Id., ¶52 (quoting Kollasch v. Adamany, 104 Wis. 2d 552, 561, 313 N.W.2d 47 (1981); then citing Fleeman v. Case, 342 So.2d 815, 818 (Fla. 1976) and Hammond v. Bingham, 362 P.2d 1078, 1079 (Idaho 1961)).  This exception to the constitutional avoidance doctrine applies no less to governmental edicts such as the Order we consider in this case.  Like other state and federal courts around the country, we have elected to answer constitutional questions of great public importance. "Courts in other jurisdictions have also recognized that the principle of constitutional avoidance gives way where the constitutional question is of great public importance."  Id. (citing State ex rel. Bland v. St. John, 13 So. 2d 161, 170 (Ala. 1943) and Buckingham v. State ex rel. Killoran, 35 A.2d 903, 904-05 (Del. 1944)).  In Gabler, we elected to decide "a separation of powers issue of great public importance."  Id., ¶53.  In this case, we opt to decide a religious liberty issue of great public importance.  In doing so, we recognize, as we did in Gabler, that "the greatest of our judges have not always followed [the constitutional avoidance doctrine] as a rigid rule.  Perhaps had they done so the great opinion of Chief Justice Marshall in Marbury v. Madison would never have been written."  Id., ¶52 (quoting Clay v. Sun Ins. Office Ltd., 363 U.S. 207, 223-24 (1960) (Black, J., dissenting)).

Treating the constitutional avoidance doctrine as a rigid principle directing courts to disregard any constitutional questions whenever a case may be resolved on statutory grounds is not only inconsistent with our precedent, it would violate the judiciary's obligation to uphold the constitution.  As part of their oath of office, judges in Wisconsin "solemnly swear" to

"support the constitution of the United States and the constitution of the state of Wisconsin." Wis. Stat. § 757.02(1). In fulfilling its sworn duty, "[t]he judiciary cannot, as the legislature may, avoid a measure because it approaches the confines of the constitution. We cannot pass it by because it is doubtful . . . with whatever difficulties, a case may be attended, we must decide it, if it be brought before us." Cohens v. Virginia, 19 U.S. 264, 404 (1821). When parties present constitutional questions of great public importance, "[t]he courts of the [United] States are bound to take notice of the constitution," and to "emphatically . . . say what the law is." Marbury v. Madison, 5 U.S. (1 Cranch) 137, 138, 177 (1803).

Contrary to Justice Hagedorn's conception of the judicial role, there is nothing unprecedented about fulfilling our responsibility to decide important constitutional questions, which was recently affirmed by this court in Gabler and has been echoed by preeminent jurists since Chief Justice John Marshall pronounced it in Marbury. Alexander Hamilton said the "duty" of the judiciary "must be to declare all acts contrary to the manifest tenor of the Constitution void. Without this, all the reservations of particular rights or privileges would amount to nothing." The Federalist No. 78, at 466 (Alexander Hamilton) (C. Rossiter ed. 1961). Accordingly, "when a case or controversy comes within the judicial competence, the Constitution does not permit judges to look the other way; we must call foul when the constitutional lines are crossed. Indeed, the framers afforded us independence from the political branches in large part to encourage exactly this kind of 'fortitude . . . to do [our] duty as faithful guardians of the Constitution.'" Gundy v. United States, 139 S. Ct. 2116, 2135 (2019) (Gorsuch, J., dissenting) (quoting The Federalist No. 78, at 470 (C. Rossiter ed. 1961) (ellipsis in original)).

Justice Hagedorn misconstrues the basis for this court's decision to resolve petitioners' religious liberty claim. No one is suggesting we must address every important constitutional question raised. In this very case we declined to decide whether the Order violates the constitutionally-protected right of parents to direct the upbringing and education of their children.

28

¶32 Turning to the Wisconsin Constitution, the Petitioners contend that the Order violates their fundamental right to the free exercise of religion under Article I, Section 18. In response, Heinrich asserts that the Order is constitutional under the United States Supreme Court's ruling in Jacobson v.

Our duty to uphold the Constitution, however, is particularly urgent when governmental action is alleged to infringe the people's fundamental right to religious freedom. "The courts have both the title and duty when a case is properly before them to review the actions of the other branches in light of constitutional provisions[.]" Herbert Wechsler, Toward Neutral Principles of Constitutional Law, 73 Harv. L. Rev. 1, 19 (1959). Declining to decide the constitutional question in this case would "shirk[] our duty" to say what the supreme law of our state is. Bond v. United States, 572 U.S. 844, 882 (2014) (Scalia, J., concurring in the judgment). Justice Hagedorn relegates what Alexander Hamilton and Chief Justice Marshall characterized as our judicial "duty" to a mere "power" to be exercised "with modesty." Concurrence, ¶58. This reformulation of the judicial role is rooted in the progressive era, when judges abandoned their obligation to uphold the Constitution in extreme deference to majoritarian impulses, thereby elevating legislative acts over the Constitution——at the expense of individual rights and liberty. See Randy E. Barnett, Our Republican Constitution: Securing the Liberty and Sovereignty of We the People 122-53 (2016). Justice Hagedorn's trepidation over fully embracing our "duty as faithful guardians of the Constitution" is incompatible with our constitutional structure, and his standard for answering constitutional questions based upon an individual justice's belief that "it is prudent to do so" would leave the people with justifiably little faith in the judiciary as a bulwark of liberty. See The Federalist No. 78, at 469 (C. Rossiter ed. 1961) ("[T]he courts of justice are to be considered as the bulwarks of a limited Constitution against legislative encroachments[.]"). Preserving the free exercise rights constitutionally retained by the people lies well within the bounds of the judicial role and is not "needlessly opin[ing]"——it is a constitutional imperative. Dissent, ¶64. As the bulwark of our Wisconsin Constitution, we should defend the people's rights with fortitude, not modesty.

29

Massachusetts, 197 U.S. 11 (1905), and that, even if Jacobson does not apply, the Order does not violate Article I, Section 18 of the Wisconsin Constitution. We hold that the Wisconsin Constitution——not Jacobson——controls the question, and those portions of the Order restricting or prohibiting in-person instruction are unconstitutional because they violate a citizen's right to the free exercise of religion guaranteed in Article I, Section 18 of the Wisconsin Constitution.[19]

### 1. Jacobson v. Massachusetts

¶33 The United States Supreme Court decided Jacobson over a century ago in the midst of the smallpox epidemic. Jacobson alleged that a Massachusetts law requiring residents to receive vaccinations violated his rights under the Fourteenth Amendment of the United States Constitution. Jacobson, 197 U.S. at 14. In essence, Jacobson brought an "implied substantive due process" claim asserting that the law violated his "bodily integrity." See Roman Catholic Diocese of Brooklyn v. Cuomo, 141 S. Ct. 63, 70 (2020) (Gorsuch, J., concurring). The Court ruled that Massachusetts's compulsory vaccination law was a "reasonable

---

[19] The Petitioners who are religious schools or parents with children attending religious schools raise an as-applied challenge to the constitutionality of those portions of the Order restricting or prohibiting in-person instruction. The remedy for violating the constitutional right to the free exercise of religion is vacating those portions of the Order as applied to those Petitioners. Because the Respondent lacks any statutory authority to close schools (whether religious or secular), we vacate those portions of the Order entirely.

exercise of [its] police power" and was constitutional under the Fourteenth Amendment. Jacobson, 197 U.S. at 35.

¶34 Contrary to Heinrich's argument, Jacobson does not apply to this case, for at least four reasons. First, the Petitioners' challenge to the constitutionality of the Order is couched entirely within Article I, Section 18 of the Wisconsin Constitution——a provision containing Wisconsin's free exercise clause.[20] In contrast, in Jacobson the defendant asserted that the compulsory vaccination law violated an implied "substantive due process" right to "bodily integrity" in violation of the Fourteenth Amendment. See Roman Catholic Diocese, 141 S. Ct. at 70 (Gorsuch, J., concurring); Jacobson, 197 U.S. at 14. The issue in Jacobson involved "an entirely different right" and "an entirely different kind of restriction" than the Petitioners' current challenge. Roman Catholic Diocese, 141 S. Ct. at 70 (Gorsuch, J., concurring).

¶35 Second, Jacobson's case did not involve a violation of the free exercise of religion under the First Amendment or any state constitution. In contrast, the Petitioners in this case challenge the government's infringement of their constitutionally-protected right to the free exercise of their religion. "Nothing in Jacobson purported to address, let alone approve, such serious and long-lasting intrusions into settled constitutional rights." Id. at 71 (Gorsuch, J., concurring).

---

[20] Article I, Section 18 contains two clauses referring to the rights of conscience, but we understand both of these provisions to protect the free exercise of religion. Coulee Catholic Sch. v. LIRC, 2009 WI 88, ¶58, 320 Wis. 2d 275, 768 N.W.2d 868.

31

¶36 Third, even if Jacobson could somehow inform a free exercise claim, the Petitioners' challenge in this case invokes a state constitutional provision that affords heightened protections for the free exercise of religion compared to its federal counterpart. See State ex rel. Warren v. Reuter, 44 Wis. 2d 201, 227, 170 N.W.2d 790 (1969). Article I, Section 18's "protections and prohibitions . . . are far more specific [than the First Amendment]" and provide "expansive protections for religious liberty." Coulee Catholic Sch. v. LIRC, 2009 WI 88, ¶60, 320 Wis. 2d 275, 768 N.W.2d 868. Indeed, the Wisconsin Constitution "provides much broader protections for religious liberty than the First Amendment." Id., ¶66. Accordingly, this court must review whether Heinrich's Order survives strict scrutiny under Wisconsin's own constitutional provisions, not whether the United States Constitution allows it; Jacobson would inform only the latter and therefore is irrelevant.

¶37 Fourth, the Jacobson Court upheld Massachusetts' compulsory vaccination law because it was "a reasonable exercise of [its] police power." Jacobson, 197 U.S. at 35. However, "in this state, constitutional rights do not expand the police power; they restrict the police power." State v. Hamdan, 2003 WI 113, ¶39, 264 Wis. 2d 433, 665 N.W.2d 785. That an order reflects an exercise of police power does not save it if the order "eviscerates [a] constitutionally protected right." Id., ¶40. Indeed, police powers are "hedged about on all sides by constitutional restraints with the judiciary to stand guard at the boundaries." State ex rel. Milwaukee Med. Coll. v. Chittenden, 127 Wis. 468, 502, 107

N.W. 500 (1906).  Our constitutional review of measures adopted by state or local health officers to curb the spread of disease is particularly important because such police powers necessarily curtail the freedom of those citizens who are subject to their exercise.[21]  In this case, we examine Article I, Section 18 of the Wisconsin Constitution to stand guard against abuses of executive

---

[21] Justice Dallet reads into the statutes the extraordinary and virtually unlimited power of local health officials to "take all measures necessary" in a pandemic, without considering any constitutional constraints on its exercise.  Justice Dallet's failure to grapple with the incompatibility of her statutory interpretation with the Wisconsin Constitution violates the foundational principle that the constitution reigns supreme over statutory law:  "[T]he Constitution is to be considered in court as a paramount law" and "a law repugnant to the Constitution is void, and . . . courts, as well as other departments, are bound by that instrument."  Marbury, 5 U.S. at 178, 180.

Instead of undertaking a constitutional analysis, Justice Dallet remarkably blames the petitioners themselves for the infringement of their own constitutional rights.  Taking a position diametrically opposed to Heinrich's and belied by the record, Justice Dallet says that "[i]f in-person education on every subject, religious or not, is truly religious practice, as some petitioners here claim, nothing in the Order burdens that practice" since "Section 8 of the Order explicitly exempts religious practices from its in-person gathering restrictions[.]"  Dissent, ¶88.  The parties' stipulated facts "torpedo" Justice Dallet's assertion.  The parties——including Heinrich——stipulated that "Emergency Order #9, itself, does not allow for the opening of in-person education for grades 3-12 under any conditions except for a new order superseding and replacing Emergency Order #9, and except for qualifying students with disabilities or an individualized education program."  Joint Stipulation of Facts #147 (emphasis added).  Had the petitioner schools tested Justice Dallet's theory, they would have exposed themselves to "a penalty of not more than one thousand dollars $1,000" for "[e]ach and every day of violation."  Joint Stipulation of Facts #170.

power——however well-intentioned——that infringe on the free exercise of religion.

    2. Article I, Section 18 of the Wisconsin Constitution

¶38 The framers of the Wisconsin Constitution understood that "religious freedom was in need of . . . protection," in order for individuals to freely exercise their religion. Jennifer A. Faulker, The Transformation of Religion in America and the Preservation of the Freedom of Religion in Wisconsin, in Defining a People, Creating a State: The Wisconsin Constitution in Jacksonian Context 201, 202 (1998). "The framers of the constitution, backed by Wisconsin residents, chose to describe the religious freedoms that they should be entitled to in greater detail than were given in the federal constitution." Id. at 223. The result was Article I, Section 18, which "contains two clauses referring to the rights of conscience . . . , which we understand to refer generally to the exercise of religious freedom." Coulee, 320 Wis. 2d 275, ¶58. In these provisions, Wisconsin's framers "use[d] the strongest possible language in the protection of this right." Id., ¶59. The clauses read, in relevant part, as follows:

> The right of every person to worship Almighty God according to the dictates of conscience shall never be infringed; . . . nor shall any control of, or interference with, the rights of conscience be permitted[.]

Wis. Const. art. I, § 18. In line with this "extremely strong language," Coulee, 320 Wis. 2d 275, ¶60, this court construes Article I, Section 18 as "more prohibitive than the First Amendment

34

of the United States Constitution." King v. Vill. of Waunakee, 185 Wis. 2d 25, 59, 517 N.W.2d 671 (1994).

¶39 When examining a law alleged to violate an individual's or organization's freedom of religious exercise, "we have generally applied the compelling state interest/least restrictive alternative test. Under this test, the [individual] or religious organization has to prove (1) that it has a sincerely held religious belief, and (2) that such belief is burdened by the application of the . . . law at issue. Upon this showing the burden shifts to the state to prove (3) that the law is based upon a compelling state interest (4) that cannot be served by a less restrictive alternative." Coulee, 320 Wis. 2d 275, ¶61 (citing State v. Miller, 202 Wis. 2d 56, 66, 549 N.W.2d 235 (1996)). Applying the strict scrutiny embodied in these four factors, Heinrich's Order unconstitutionally infringes the Petitioners' freedom of religious exercise.

¶40 For the first factor, all petitioners have sincerely-held religious beliefs, to which the respondent expressly stipulated. James, for example, believes that it is essential for her children to receive a faith-based education and that such education must take place "in-person" and "together with others as part of the body of Christ." James sent her children to Our Redeemer Lutheran School precisely to fulfill this religious mission. Likewise, WCRIS and its member schools, along with other petitioners joining WCRIS' action, declared that "in-person religious instruction" is a "vital part of [the students'] religious formation." Parents of children attending these schools

35

specifically chose these institutions so their children could "participat[e] in [their] religious activities in-person" and "exercise their faith."

¶41 The parents of students at St. Ambrose Academy hold similar beliefs. They attest it was important for their children to attend St. Ambrose, a Catholic institution, so that its teachers could "closely mentor [their] students to foster a deep love of Jesus Christ and [to] encourage them to imitate a life of virtue and service to Christ and His Church." In order to practice their faith, the parents embrace the importance of their children receiving the sacrament of Holy Communion at weekly Masses and engaging in communal prayer throughout the day. St. Ambrose specifically states that its "religious mission depends on in-person attendance to be fully realized," given that the "community experience . . . is a mark of educational activity."[22] The Petitioners clearly demonstrate sincerely-held religious beliefs, uncontested by Heinrich; accordingly, they satisfy the first factor.

¶42 Turning to the second factor, the Order incontrovertibly burdens Petitioners' beliefs. The Petitioners established that in-person religious instruction is a vital part of the exercise of their religion. Under Heinrich's Order, all schools in Dane County—including these private religious institutions—were required to cease all in-person instruction for students in grades

---

[22] The other religious schools joining St. Ambrose in this action echo similar beliefs.

36

3-12 and instead provide a virtual learning environment. Consequently, all in-person religious practices interwoven with religious education at these schools——ones deemed essential to the Petitioners' exercise of their faith——were suspended by government decree.

¶43 Indeed, the Order did not merely burden academic schooling; it burdened the exercise of religious practices. While Heinrich allowed schools to use their premises for child care and youth recreational activities, the government barred students from attending Mass, receiving Holy Communion at weekly Masses with their classmates and teachers, receiving the sacrament of Confession at school, participating in communal prayer with their peers, and going on retreats and service missions throughout the area.[23] As the United States Supreme Court has opined, "the 'exercise of religion' often involves not only belief and profession but the performance of . . . physical acts[,] [including] assembling with others for a worship service." Emp. Div., Dep't of Hum. Res. of Oregon v. Smith, 494 U.S. 872, 877 (1990) (emphases added). "Our Founders conceived of a Republic receptive to voluntary religious expression, and provided for the possibility of judicial intervention when government action

---

[23] Contrary to Heinrich's argument, it is of no import that the Order may be neutral and generally applicable to all schools. Unlike federal jurisprudence and in light of Article I, Section 18's heightened protection for the free exercise of religion, this court considers whether the petitioners' sincerely-held beliefs were burdened by the application of the law at issue, even if the Order governs secular schools as well. See DeBruin v. St. Patrick Congregation, 2012 WI 94, ¶26 n.8, 343 Wis. 2d 83, 816 N.W.2d 878.

threatens or impedes such expression." McCreary Cnty., Ky. v. Am. Civ. Liberties Union of Ky., 545 U.S. 844, 883 (2005) (emphasis added). Heinrich's Order not only impeded the Petitioners' religious expression and practice, it outright precluded both from occurring in Petitioners' schools altogether. The Petitioners' exercise of their sincerely-held beliefs was unquestionably "burdened by the application" of the Order,[24] and the Petitioners accordingly satisfied the second factor.

¶44 Because the Petitioners satisfy both the first and second factors, the burden shifts to Heinrich to prove that her Order is "based upon a compelling state interest . . . that cannot be served by a less restrictive alternative." Id. She fails to meet this burden. For public health purposes, the State certainly has a compelling interest in slowing the spread of COVID-19. The Petitioners do not dispute this point. However, the Order does not impose the "least restrictive" means of doing so.

¶45 "The least-restrictive-means standard is exceptionally demanding, and it requires the government to show that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting party." Holt v. Hobbs, 574 U.S. 352, 364-65 (2015) (citations and

---

[24] This is not to say, however, that "anything interfering with a religious organization is totally prohibited." Coulee, 320 Wis. 2d 275, ¶65. In this case, however, "[w]e need not explore the outer boundaries" of the Wisconsin Constitution's protections of religious liberty because the Order unquestionably burdens the Petitioners' sincerely-held religious beliefs by prohibiting in-person religious education. Id., ¶66.

internal quotations omitted). "If a less restrictive means is available for the Government to achieve its goals, the Government must use it." Id. at 365 (citations and internal quotations omitted). Heinrich's earlier orders implemented less restrictive means such as specifying classroom student limits, mandating the use of masks, and requiring social distancing. In Emergency Order #8, for example, Heinrich outlined detailed safety protocols for schools, including "[e]nsuring students are at least six (6) feet from other students" and requiring that "employees are provided with and wear face coverings." These nuanced and tailored measures were completely abandoned in the Order at issue, replaced by the drastic step of forbidding in-person religious school education entirely for students in grades 3-12.

¶46 The Order distinguishes between the age demographics of students, permitting only students in grades K-2 to receive in-person instruction while relegating all students in grades 3-12 to virtual instruction only. By the Order's own reasoning, this distinction was unnecessary to achieve the government's goals. As stated in the Order's introduction, "[o]utbreaks and clusters among cases aged 5-17 have been rare." Nevertheless, a five-year-old student in kindergarten and an eight-year-old student in third grade, despite comparable infrequencies of COVID-19 transmission, were afforded entirely different educations in Dane County.

¶47 Furthermore, while students in grades 3-12 were prohibited from attending school in person, the Order allowed all higher education institutions to continue to provide in-person learning and dormitory housing, subject to certain restrictions.

39

The Order failed to explain why college-aged students could continue to live, learn, and socialize in close communities, while students in grades 3-12 were consigned to computer screens. While the Order demonstrates the availability of less restrictive alternatives and employs them for college students as well as students in grades K-2, the Order denies them to students in grades 3-12. For this reason, the Order fails under the fourth factor for establishing a freedom of religion claim.

¶48 In total, the Order fails the strict scrutiny test: the application of the Order burdens the Petitioners' sincerely-held religious beliefs, and Heinrich fails to demonstrate why the Order, although based upon a compelling interest, cannot be met by less restrictive alternatives. Accordingly, Heinrich's Order violates Article I, Section 18 of the Wisconsin Constitution, which the government may not override, even in a pandemic. "Even in times of crisis——perhaps especially in times of crisis——we have a duty to hold governments to the Constitution." South Bay United Pentecostal Church v. Newsom, 141 S. Ct. 716, 718 (2021) (granting in part an application for injunctive relief) (statement of Gorsuch, J.).

IV. CONCLUSION

¶49 Those portions of Heinrich's Order restricting or prohibiting in-person instruction are both statutorily and constitutionally unlawful, and are hereby vacated. Local health officers do not have the statutory authority to close schools under Wis. Stat. § 252.03. Article I, Section 18 of the Wisconsin Constitution——not Jacobson——controls the constitutional question.

40

Because Heinrich's Order violates the Petitioners' fundamental constitutional right to the free exercise of religion, it cannot stand.

*By the Court.*—Rights declared; order vacated*.*

¶50 BRIAN HAGEDORN, J. *(concurring).* Today's decision correctly interprets the statutes, and faithfully applies our precedent on the religious liberty protections ratified in the Wisconsin Constitution. I join the court's opinion in all respects, with the exception of footnote 18. I write separately to discuss the proper role of this court in addressing constitutional questions——both when we should decide these issues and how we ought to do so.

I

¶51 The dissent criticizes the court for deciding the religious liberty question raised in this case. The general rule, the dissent points out, is to decide cases on the narrowest grounds, especially avoiding needless engagement with constitutional questions unless required to decide the case.[1] The dissent is correct; this is the general rule, and it is a good rule. It recognizes that the primary role of the judiciary is to decide disputes between parties. And it is grounded in a sense of epistemic and judicial humility——we often don't know what we don't know, and we're quite capable of unwitting error. That's a bad thing anytime, but it's especially bad when expounding on the constitution that serves as the foundation for the existence, operation, and success of our republic. So we should decide cases on narrow and firm grounds, and in ways that avoid the risk of judicial error——particularly on constitutional questions.

---

[1] Dissent, ¶85.

¶52 The opinion for the court responds in footnote 18.[2] It first observes that this doctrine is a general rule and not rigidly applied in all cases.[3] I agree. But portions of footnote 18 go further and suggest that when the issue is of "great public importance," addressing it is mandatory.[4] Not deciding an important constitutional question, it claims, would "violate the judiciary's obligation to uphold the constitution," disregarding our oath of office.[5] Failing to address it would therefore "shirk our duty," and possibly violate the constitution itself (addressing the religious liberty question "is a constitutional imperative").[6]

¶53 This assertion——that we are duty-bound to address important constitutional questions raised in a case even though it can be resolved on other grounds——is without precedent. I am unaware of any appellate court, state or federal, anywhere around the country having ever adopted this as a rule for judicial decision-making. It certainly has no basis in our cases, nor will

---

[2] Because I do not join it, footnote 18 does not garner a majority of the court and does not constitute part of the precedential opinion of the court.

[3] Majority op., n.18.

[4] Id.

[5] Id.

[6] Id. (alteration omitted).

you find it in the decisions of the United States Supreme Court.[7] Rather, the Wisconsin Constitution, like the Constitution of the United States, envisages a far more circumscribed role for the judiciary.

¶54 Under the Constitution, the judiciary was designed to be the least dangerous branch.[8] This is because its ability to act was limited, making it the least able to dominate the other

---

[7] Our cases do not support the broad theory proposed. Quite the contrary, we have explained the default rule consistently: "As a matter of judicial prudence, a court should not decide the constitutionality of a statute unless it is essential to the determination of the case before it." Kollasch v. Adamany, 104 Wis. 2d 552, 561, 313 N.W.2d 47 (1981); see also State v. Frear, 138 Wis. 173, 176, 119 N.W. 894 (1909) (per curiam) ("Sound judicial policy precludes the court from considering the question of the constitutionality of a legislative act unless a decision respecting its validity is essential to the determination of some controversy calling for judicial solution.").

In footnote 18, the opinion also claims support in the writings of Alexander Hamilton, Chief Justice John Marshall, Justice Neil Gorsuch, Justice Antonin Scalia, and Justice Clarence Thomas, among others. However, none of citations, and none of the named authors, have supported the proposition advanced——that the court must address certain constitutional questions of great importance when properly presented. Instead, the United States Supreme Court has the same general rule that this court has embraced: "[W]e ought not to pass on questions of constitutionality unless such adjudication is unavoidable." Matal v. Tam, 137 S. Ct. 1744, 1755 (2017) (cleaned up); see also Tory v. Cochran, 544 U.S. 734, 740 (2005) (Thomas, J., dissenting) ("As a prudential matter, the better course is to avoid passing unnecessarily on the constitutional question.").

[8] The Federalist No. 78, at 464 (Clinton Rossiter ed. 2003).

branches and the least likely to trample the liberty of the people.[9] The Wisconsin Constitution follows this same design.[10] While this vision held sway for some time, in recent years, the judiciary has insisted on a far more expansive role for itself. A distorted conception of judicial supremacy has taken hold, all too often inserting the judiciary into nearly every aspect of public life. Justice Scalia aptly called this dangerous development the "overjudicialization of the process of self-governance."[11]

¶55 To be sure, the judiciary was granted real power and given real responsibilities. An independent judiciary is an indispensable guardian of our constitutional order. When parties properly bring cases before us, we serve the essential functions of resolving disputes about the law and ensuring that the law is followed. We would be derelict in our duty if we simply deferred to other public or private actors when appropriately raised questions requiring an answer come our way.[12] We should not avoid the hard questions, including constitutional questions, when

---

[9] Id. ("The judiciary . . . has no influence over either the sword or the purse; no direction either of the strength or of the wealth of the society, and can take no active resolution whatever.").

[10] Serv. Emps. Int'l Union, Loc. 1 v. Vos, 2020 WI 67, ¶31, 393 Wis. 2d 38, 946 N.W.2d 35.

[11] Antonin Scalia, The Doctrine of Standing as an Essential Element of the Separation of Powers, 17 Suffolk U. L. Rev. 881, 881 (1983).

[12] We also must be faithful in addressing the legal questions we do address. There is no room to rewrite statutes in an effort to avoid addressing a complicated constitutional question.

4

addressing them is necessary. It is our solemn duty to say what the law is when cases require us to do so.

¶56 Our constitution, then, paints a picture of a judiciary that is at once courageous and humble, one that exercises the judicial power with fortitude and modestly acknowledges where its power and duties end. This is why judicial modesty and judicial fortitude are among the cardinal judicial virtues. Humility without courage can lead to an abdication of our judicial duty to declare the law in cases properly before us.[13] Courage unbounded by the humility to recognize and accept the limits of the judicial role quickly leads to the rule of judges, rather than the rule of law.

¶57 We need——and the constitution requires of us——both modesty and fortitude, humility and courage. We are not charged by the constitution to provide clarity whenever a constitutional question is unresolved. We are not empowered to ensure all constitutional violations are corrected. The United States Supreme Court has explained that "under our constitutional system courts are not roving commissions assigned to pass judgment on the validity of the Nation's laws."[14] Instead, "Constitutional judgments . . . are justified only out of the necessity of

---

[13] I too reject the kind of judicial modesty that advocates "extreme deference to majoritarian impulses" or one that reflects a "trepidation over fully embracing our duty to be faithful guardians of the Constitution." See Majority op., n.18 (internal quotation marks omitted).

[14] United States v. Sineneng-Smith, 140 S. Ct. 1575, 1587 (2020) (Thomas, J., concurring) (alterations omitted) (quoting Broadrick v. Oklahoma, 413 U.S. 601, 610-11 (1973)).

5

adjudicating rights in particular cases between the litigants brought before the Court."[15] In other words, we are not law-declarers-in-chief; we are case-deciders.

¶58 That is why the general rule is correct and, so far as I can tell, universally accepted: cases should ordinarily be decided on narrow grounds, reaching only what is necessary to decide the case.[16] Consistent with this rule, we generally do not issue advisory opinions or decide cases where we cannot provide relief to the injured party. Nothing about our case-deciding role, and nothing about the judicial power itself, requires us to address every question we deem important, constitutional or otherwise, when the dispute is effectively resolved on other grounds. Judicial modesty remembers that we make mistakes, we often don't know what we don't know, and that these realities are compounded when complicated constitutional questions are involved. Our role is modest and limited; it is important for the rule of law that we keep it that way.

¶59 That said, I believe addressing the religious liberty question in this case is appropriate for several reasons. First, government actors issuing health-related orders during this pandemic have at times been inattentive to religious liberty

---

[15] Broadrick, 413 U.S. at 611.

[16] See 16 C.J.S. Constitutional Law, § 212 ("A longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them."); id. (collecting cases).

6

concerns, as this case and others around the country demonstrate.[17] This is a reoccurring issue, and decision-makers should understand the legal requirements that must inform their decisions in this area.  Second, Heinrich argued that religious liberty deserves almost no additional protection, relying largely on the United States Supreme Court's 1905 decision in Jacobson.[18]  This argument has been oft-repeated in cases around the country during the pandemic and is incorrect.[19]  The court's opinion today resolves this important question, which gives needed guidance to the public. Finally, we blaze no new ground in reaffirming and applying well-settled law.  Religious liberty receives heightened protection under the Wisconsin Constitution.  That's what the text says, and our precedent is clear.[20]  Today's decision appropriately applies the governing test in this area.  Therefore, even though it is true that we need not address the constitutional question in this case, it is prudent to do so.  These are important questions with immediate consequences far beyond this case.  They were fully presented, fully briefed, and our decision provides clarity where it is needed.  My disagreement is only with the notion in footnote 18 that judicial duty requires us to answer this question.

---

[17] See, e.g., Roman Catholic Diocese of Brooklyn v. Cuomo, 141 S. Ct. 63 (2020) (per curiam).

[18] Jacobson v. Massachusetts, 197 U.S. 11 (1905).

[19] See Roman Catholic Diocese of Brooklyn, 141 S. Ct. at 70-71 (Gorsuch, J., concurring).

[20] See Wis. Const. art. I, § 18; Coulee Catholic Sch. v. LIRC, 2009 WI 88, 320 Wis. 2d 275, 768 N.W.2d 868.

II

¶60 Finally, I write further to extend an invitation to litigants. As those familiar with this court's jurisprudence know, we are committed to reading statutes according to their plain meaning. Because the text is the law, we focus our interpretive inquiry on the text, context, and structure of statutory language, seeking to understand what the words meant when they were written.[21] This court is often the beneficiary of excellent briefing and argument directing us to exactly that——the meaning of the statutory text.

¶61 Our constitutional jurisprudence should be no different. Far too often, our cases have simply copied and pasted federal case law and called it Wisconsin constitutional law. And at times, this court has drifted from a jurisprudence rooted in the text and appealed instead to its own sense of justice. But our constitution means what it says, not what federal cases say, and not what we might want it to say. Our role is to discern the meaning of the words approved by the people and apply them faithfully. No matter how captivating a clarion call for justice may be, the text of the Wisconsin Constitution is the law to which we are bound.[22]

¶62 Our return to a method of statutory interpretation based not on policy concerns, but on the text of the law itself, has

---

[21] State ex rel. Kalal v. Cir. Ct. for Dane Cnty., 2004 WI 58, ¶¶44-52, 271 Wis. 2d 633, 681 N.W.2d 110; Vos, 393 Wis. 2d 38, ¶28.

[22] Vos, 393 Wis. 2d 38, ¶28.

been a breath of fresh air in Wisconsin courts.[23]  It is time to reinstitutionalize the same norms in our constitutional analysis.[24]  Therefore, my request is this.  When raising claims based on the Wisconsin Constitution, bring us a textual analysis rooted in the original public meaning of the words of the Wisconsin Constitution.  Of course, litigants should employ and explain our precedent.  But especially when raising claims of a novel character, recourse to first principles is most appropriate, and briefing focused on the original public meaning of the Wisconsin Constitution is therefore most welcome.

---

[23] See generally Daniel R. Suhr, Interpreting Wisconsin Statutes, 100 Marq. L. Rev. 969 (2017).

[24] Indeed, we adhered to this method in our earliest interpretations of the Wisconsin Constitution.  See State ex rel. Bond v. French, 2 Pin. 181, 184 (Wis. 1849) ("In deciding this question, our only guide is the constitution, in construing which we are to be governed by the same general rules of interpretation which prevail in relation to statutes."); see also Daniel R. Suhr, Interpreting the Wisconsin Constitution, 97 Marq. L. Rev. 93, 96- 97 (2013) ("In the earliest days of the state, the Wisconsin Supreme Court used the same methodology to interpret both constitutional and statutory texts.  Until 1974, the court relied on classical principles for all interpretive questions." (footnote omitted)).

¶63 REBECCA FRANK DALLET, J. (*dissenting*). This is not a difficult statutory interpretation case. The only statutory question before the court is whether Wis. Stat. § 252.03 prohibits local health officers from closing schools. It takes no special "canons" or abstract linguistic principles——only a common sense understanding of the English language——to see that it does not. I therefore dissent.

¶64 I also dissent because there is no reason for the majority opinion's constitutional analysis. The majority's statutory analysis, flawed as it is, fully resolves the case. Simply put, the Order cannot possibly violate anyone's constitutional rights because the majority strikes down the Order. But the majority abandons both judicial restraint and our precedent to needlessly opine on the petitioners' constitutional challenge.

I

¶65 Wisconsin Stat. § 252.03 plainly says what it means and means what it says. It requires local health officers to "promptly take all measures necessary to prevent, suppress[,] and control communicable diseases," and authorizes them to "do what is reasonable and necessary" for the prevention and suppression of disease. Nothing about those words necessarily prevents Dane County's Public Health Director from closing schools to suppress and control COVID-19.[1] The statute's plain language, its history, and numerous related statutes all confirm that local health

_____

[1] Whether the Order was "necessary" or "reasonable" is a fact-based question that is not before the court.

1

officers may close schools, so long as doing so is at least reasonable and necessary to suppress disease.

A

¶66 Ever since the legislature enacted the first statute addressing disease outbreaks in 1883, it has entrusted to local health officers the power and flexibility to respond to disease outbreaks. See Wis. Stat. ch. 167, § 1 (1883). That initial statute required every locality to establish its own board of health, which subsequently appointed a health officer. Id. One of the local health officer's duties was to "at all times promptly . . . take such measures for the prevention, suppression[,] and control [of contagious diseases] as may in his judgment be needful and proper," subject to the local health board's approval. Id. Then, in the aftermath of the 1918 Spanish Flu outbreak, the legislature granted to local boards of health the similar but more inclusive power to do "what is reasonable and necessary for the prevention and suppression of disease," including "forbid[ding] public gatherings when deemed necessary to control epidemics." See Wis. Stat. ch. 159, § 1411-5 (1919). After a 1981 amendment, that power now belongs to local health officers rather than local health boards. See § 23, ch. 291, Laws of 1981. For our purposes here, the legislature has since made no other substantive changes to the statute's text.[2]

¶67 Today, local health officers continue to have the authority and duty to act quickly to "prevent, suppress[,] and

---

[2] The legislature restructured the public health statutes in 1923 and renumbered them 70 years later, but the relevant language has stayed the same. See § 14, ch. 448, Laws of 1923; 1993 Wis. Act 27, § 285; Wis. Stat. § 252.03.

control communicable diseases." See § 252.03(1). At the first sign of an outbreak, local health officers' obligations are mandatory and time sensitive: they "shall" investigate "immediately" and act "promptly." Id. To that end, the legislature gives local health officers the discretion to determine how best to react, instructing them to "take all measures necessary" to stop the disease's spread. Id.. Should local health officers "fail" to take "all measures necessary" to stop the disease's spread, the state Department of Health Services (DHS) "shall take charge" at the local government's expense. § 252.03(3).

¶68 By contrast, DHS's statutory authority to control disease outbreaks is more targeted. For instance, the legislature has granted DHS (and its predecessor, the state board of health) the power to "forbid public gatherings when deemed necessary to control epidemics," but only in "schools, churches, and other places." § 252.02(3); see also Wis. Stat. ch. 674, § 1407a-6.2 (1913). Local health officers' power to forbid public gatherings contains no similar limitation. See § 252.03(2). Moreover, DHS "may" take only "emergency" measures to control the spread of disease after an outbreak occurs; but local health officers must take "all" measures to not only control outbreaks but also to prevent them. See §§ 252.02(6); 252.03(1)-(2). Thus, despite some overlap in local and state health officers' powers, the textual distinctions between §§ 252.02 and 252.03 reveal fewer limitations on local officers' authority to respond to diseases

and to prevent their spread.[3] And none of those limitations prevent a local health officer from closing schools.

---

[3] The majority twice errs regarding the history of Wis. Stat. §§ 252.02 and 252.03. First, while the statutes were renumbered at the same time, they were drafted and enacted decades apart. Second, building on its false premise, the majority mistakenly concludes that the statutes' history supports only one conclusion. A full examination of the historical evidence, however, reveals at least one other reasonable inference, with no principled way of choosing between the two.

An earlier draft of Wis. Stat. ch. 159, § 1411-5 (1919)——the predecessor to Wis. Stat. § 252.03(2)——gave local health officers the power to "close schools, theaters[,] and churches," mirroring the state health board's power, but without the qualification "when deemed necessary to control epidemics." See 8 Wis. Op. Att'y Gen. 157, 157 (1919). The state attorney general warned that, without such qualification, the statute may be unconstitutional as an unlimited and arbitrary grant of power to local officials. Id. He suggested, however, that if the legislature rephrased the provision to read "when necessary to control epidemics, [local health officers] may forbid public gatherings and close schools, theaters, and churches," that would cure any "constitutional objections to the bill." Id. at 158 (emphasis added). The enacted text jettisoned the specific "close schools, theaters[,] and churches" language for the more open-ended power "to order and execute what is reasonable and necessary," while still limiting such actions to those related to "the prevention and suppression of disease." See Wis. Stat. ch 159, § 1411-5 (1919).

That history reveals two equally reasonable inferences. One is that the legislature removed the "close schools" language from the draft bill because it intended only for DHS to have the power to close schools. The other is that the legislature removed that language because it did not intend to restrict local health officers' response options to only closing schools, theaters, and churches. Neither inference is more or less consistent with the statute's plain text. The legislative history is therefore no help in resolving this case. See Greenwood v. United States, 350 U.S. 366, 374 (1956) ("[W]hen the legislative history is doubtful, go to the statute."). Accordingly, our analysis starts and ends with the statute's plain text, which on its face does not prohibit local health officers from closing schools.

B

¶69 Contrary to the majority's analysis, the statute itself is "perfectly clear"; there is no "troublesome statutory language" here that requires a "set of arcane rules" to understand. See Facebook, Inc. v. Duguid, 592 U.S. ___, 141 S. Ct. 1163, 1175 (2021) (Alito, J., concurring); Benson v. City of Madison, 2017 WI 65, ¶31, 376 Wis. 2d 35, 897 N.W.2d 16 (explaining that there is "no need to resort" to "canon[s]" of statutory interpretation when a statute's meaning is "not unclear"). In straying from the clear language of § 252.03, the majority opinion impermissibly adds language to the statute, misinterprets local health officers' other duties, and nullifies a host of other statutory provisions.

1

¶70 Nowhere in the legislature's directive under § 252.03 that a local health officer "promptly take all measures necessary to prevent, suppress[,] and control" disease outbreaks did the legislature add the caveat "except close schools" or "except the measures DHS may take under § 252.02." The majority cannot "read into the statute a limitation the plain language does not evidence." See County of Dane v. LIRC, 2009 WI 9, ¶33, 315 Wis. 2d 293, 759 N.W.2d 571. And there is no textual evidence for the majority to conclude that when the legislature directed local health officers to take "all" measures reasonable and necessary to control a disease outbreak, it did not mean exactly what it said. See State ex rel. Kalal v. Cir. Ct. for Dane Cnty., 2004 WI 58, ¶39, 271 Wis. 2d 633, 681 N.W.2d 110 ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." (quoting

5

Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253-54 (1992))); see also Benson, 376 Wis. 2d 35, ¶25 (explaining that courts must not "arbitrarily limit[]" general terms; rather such terms "are to be accorded their full and fair scope" (quoted source omitted)). Reading in to the statute a phantom restriction impossibly requires the legislature to write statutes today that specifically address all potential situations in the future, even those "not readily imagined." See United States v. Persichilli, 608 F.3d 34, 40 (1st Cir. 2010).  The more sensible reading of § 252.03 is that when the legislature wrote "all measures," it meant all measures.

¶71  Similarly, there is no reason why DHS and local health officers cannot share the power to close schools.  The legislature is free to grant different entities similar powers to accomplish the same ends, as it did in granting both DHS and local health officers the same power to "forbid public gatherings."  See §§ 252.02(3), 252.03(2); City of Kaukauna v. Vill. of Harrison, 2015 WI App 73, ¶10, 365 Wis. 2d 181, 870 N.W.2d 680.  Moreover, while some disease outbreaks, such as COVID-19, are so widespread that DHS may need to close schools across the state, others may affect only one community.  Thus, to "remove any doubt and make doubly sure" that it left no gaps in officials' ability to respond to outbreaks both local and statewide, it is unsurprising that the legislature "employ[ed some] overlap or redundancy" in state and local officials' powers.  See Loving v. IRS, 742 F.3d 1013, 1019 (D.C. Cir. 2014).  And without clear language to the contrary, nothing about DHS having the power to close schools statewide negates local health officers' power to close their local schools when reasonable and necessary to prevent the spread of disease.

6

2

¶72 The statute's plain language also undermines the majority's argument that local health officers' specific power to inspect schools under § 252.03(1) somehow preludes them from closing schools under § 252.03(2). The text indicates that those powers have significantly different scopes and are not mutually exclusive. A local health officer may inspect a school "as needed" to verify that "the buildings are kept in a sanitary condition." § 252.03(1). She may close a school, however, if doing so is reasonable and necessary to prevent and suppress disease. § 252.03(2). Nothing about being able to close local schools when "reasonable and necessary" to prevent and suppress disease is redundant with the power to inspect schools' sanitary conditions at any other time. Moreover, local health officers' mandate to "take all measures necessary" and authorization to "do what is reasonable and necessary" become meaningless if, as the majority claims, § 252.03 allows them only to "inspect schools" and "forbid gatherings." Cf. Moreschi v. Vill. of Williams Bay, 2020 WI 95, ¶13, 395 Wis. 2d 55, 953 N.W.2d 318.

3

¶73 The majority's reading nullifies not only much of the language of § 252.03, but also that of numerous other statutory provisions that acknowledge local health officers' power to close schools. See id. (explaining that statutory terms must be read in their broader statutory context and in a way that is consistent with other statutes that address the same subject matter). Heinrich points to at least three statutes and one administrative code provision recognizing that local health officers' orders may

7

close schools. See Wis. Stat. § 115.01(10)(b) (defining "school days" to include "[d]ays on which school is closed by order of a local health officer"); § 118.60(12) (precluding the department of public instruction from withholding payment to a private school under the parental-choice program if that school "is closed for at least 10 school days . . . by a local health officer"); § 120.12(27)(a) (requiring the school board to notify the department of public instruction within 24 hours of a school being closed due to a local health officer's order); Wis. Admin. Code § PI 8.01(4) (defining "school closure," in part, as a closure by order of a local health officer). Undoubtedly these provisions, some of which the legislature enacted in response to the COVID-19 epidemic, have meaning only if local health officers have the authority to close schools under § 252.03.

¶74 In brushing off those provisions because they do not explicitly grant local health officers the power to close schools, the majority opinion misunderstands their obvious implication: § 252.03, by authorizing measures "reasonable and necessary for [disease] prevention and suppression," already gives local health officers that power. The majority's reading of those provisions impermissibly renders them all meaningless, effectively repealed by the court. See Kalal, 271 Wis. 2d 633, ¶46 (explaining that "the court is not at liberty to disregard the plain, clear words of the statute" (quoted source omitted)).

4

¶75 The majority's last gasp is a strawman: that what is "reasonable and necessary" cannot mean that local health officers have "any powers necessary" to combat outbreaks. Of course,

Heinrich argues no such thing.  The majority opinion ignores the limiting principle plainly present both in the statute's scope (authorizing public health measures) and its text ("for the prevention and suppression of disease").  See, e.g., Am. Power & Light Co. v. SEC, 329 U.S. 90, 104-05 (1946).  What the majority claims "cannot be" already isn't.

## II

### A

¶76 The majority opinion's flawed conclusion is a direct result of its flawed methods.  The majority over-relies on "canons" or "rules" of statutory interpretation from Antonin Scalia and Brian A. Garner's book, Reading Law:  The Interpretation of Legal Texts (2012), without due regard for their limits.  To start with the obvious, Scalia and Garner's book is not the law.  In a strict sense, it is an extrinsic source that has no binding authority on this court.  Indeed, some of the book's "rules" are irreconcilable with this court's precedent.  Compare MBS-Certified Pub. Accts., LLC v. Wis. Bell, Inc., 2012 WI 15, ¶58, 338 Wis. 2d 647, 809 N.W.2d 857  ("Remedial  statutes  should  be  liberally construed . . . ."), with Scalia & Garner, supra, at 364-66 (alleging that it is a "false notion that remedial statutes should be liberally construed").  In a broader sense, it is a compilation of certain grammar rules, some of which can occasionally help determine what legislative text means.  In both senses, it is just one  toolbox  that  contains  some——but  not  all——statutory-interpretation tools.  Thus, we should be careful not to treat it as though it is the only toolbox available.

¶77 We also should be wary of assuming that interpretive tools are necessary or even relevant to every statutory interpretation case. See State v. Peters, 2003 WI 88, ¶14, 263 Wis. 2d 475, 665 N.W.2d 171. Interpretive tools may be helpful in clearing up confusing or ambiguous text, but statutory text is often straightforward. And when a statute's text "has a plain and reasonable meaning on its face," interpretive tools are "inapplicable." Id. Worse, treating interpretive tools as "rigid rules" without acknowledging their caveats and limitations can "lead[] us astray" from the plain text. See Duguid, 141 S. Ct. at 1173-75 (Alito, J., concurring).

¶78 Even when interpretive tools are relevant or helpful, they are not gospel. See, e.g., id. at 1173 (cautioning that while Scalia and Garner's chosen canons are sometimes "useful tools, . . . it is important to keep their limitations in mind"). Although certain textualists believe that applying select interpretive canons will always reveal the legislative text's true meaning, reality offers little support for that belief. Particularly damning is the fact that most legislative drafters have no idea what the interpretive canons are. See, e.g., William Baude & Stephen E. Sachs, The Law of Interpretation, 130 Harv. L. Rev. 1079, 1123-26 (2017); Abbe R. Gluck & Lisa Schultz Bressman, Statutory Interpretation from the Inside——An Empirical Study of Congressional Drafting, Delegation, and the Canons: Part II, 66 Stan. L. Rev. 725, 742-46, 745 tbl.1 (2014). And in the rare instance a drafter knows of a particular canon, such "awareness d[oes] not translate to routine use in the drafting process." Abbe R. Gluck & Lisa Schultz Bressman, Statutory Interpretation from

10

the Inside——An Empirical Study of Congressional Drafting, Delegation, and the Canons: Part I, 65 Stan. L. Rev. 901, 932-48 (2013). To take a specific example, statutory drafters who know that courts often refer to dictionaries to interpret statutory text note nevertheless that dictionaries are "mostly irrelevant" to writing statutes. Id. at 938 (one drafter added, bluntly, "no one uses a freaking dictionary"). Just like other interpretive tools, dictionaries, while sometimes helpful, can be misused if their limitations are ignored. See, e.g., Noffke v. Bakke, 2009 WI 10, ¶¶60-64, 315 Wis. 2d 350, 760 N.W.2d 156 (Abrahamson, C.J., concurring) (cautioning that while dictionaries reveal the many ways a word "can be used," they are generally unhelpful in determining whether one meaning or another is how that word is commonly or ordinarily used).

¶79 Additionally, most canons are notoriously malleable, and there is no concrete approach for choosing between multiple or conflicting canons. See, e.g., Anita Krishnakumar, Dueling Canons, 65 Duke L.J. 909 (2016). Those problems undermine the claim, touted by devotees of Scalia and Garner's brand of textualism, that strictly adhering to the canons leads to strictly objective results; in reality, that approach is just as subjective as any other. See, e.g., Brett M. Kavanaugh, Fixing Statutory Interpretation, 129 Harv. L. Rev. 2118, 2156-57, 2159-62 (2016) (book review) (explaining that some "fancy-sounding canons . . . warrant little weight in modern statutory interpretation," in part because they often lead to "wrongheaded" judicial "policymaking"); Baude & Sachs, supra, at 1140-43; Richard A. Posner, The Incoherence of Antonin Scalia,

11

https://newrepublic.com/article/106441/scalia-garner-reading-
the-law-textual-originalism. For that reason, some states, such
as Oregon, have "virtually banished the substantive canons of
construction" because they "inject[] subjectivity and
unpredictability into . . . statutory interpretation." Abbe R.
Gluck, Statutory Interpretation Methodology as "Law", 47
Willamette L. Rev. 539, 546-47 (2011). Oregon's approach, of
course, still allows courts to use the textual canons, which are
really just general grammar rules. But see Lockhart v. United
States, 577 U.S. 347, 363-69 (2016) (Kagan, J., dissenting)
(pointing out that even certain textual "rules," such as the last-
antecedent rule, often conflict with "ordinary usage"); Baude &
Sachs, supra, at 1125-26. In any event, when we employ any tool
or canon, we must do so with our eyes open to its shortcomings
rather than naïvely championing it as a perfect method for
interpreting all statutory language.

B

¶80 These shortcomings pervade the majority opinion, where
the majority's resorting to statutory interpretation canons leads
it astray from the statute's plain language. It misapplies, for
instance, the general principle that a specific provision controls
over a broader one. That principle applies only when necessary to
harmonize two conflicting statutes. See Kramer v. Hayward, 57
Wis. 2d 302, 311, 203 N.W.2d 871 (1973); Scalia & Garner, supra,
at 183 ("The general/specific canon . . . deals with what to do
when conflicting provisions simply cannot be reconciled——when the
attribution of no permissible meaning can eliminate the
conflict."). But here, there is no conflict between DHS's and

12

local health officers' authority. The legislature simply gave local health officers, who are potentially the first to respond to a communicable disease, more flexibility.

¶81 Similarly, the majority's use of the "surplusage" canon is unhelpful because it supports Heinrich's position just as much as the majority's, if not more. Using that tool, courts are supposed to read a statute to give full effect, when possible, to every word in the statute: "If a provision is susceptible of (1) a meaning that . . . deprives [a] provision of all independent effect, and (2) another meaning that leaves both provisions with some independent operation, the latter should be preferred." Scalia & Garner, supra, at 176. As explained above, the majority's position deprives of independent effect § 252.03's mandate that a local health officer take "all" necessary measures as well as every statutory provision that references a local health officer closing schools. Supra, ¶¶11-13. Heinrich's position, on the other hand, maintains the independent effect of all relevant provisions. Id. Thus, to the extent the canon against surplusage counsels in favor of either position, it does so more strongly for Heinrich's.

¶82 The point is that statutory interpretation tools are just like every other tool: they are useless without a matching problem. When an interpretive tool is needlessly or incorrectly applied, it can lead to a result contrary to the "more natural reading" of the text; and in such cases, the tool should be rejected. See, e.g., Encino Motorcars, LLC v. Navarro, 584 U.S. ___, 138 S. Ct. 1134, 1141-42 (2018) (declining to apply a "canon" because it resulted in an "unnatural fit" with the statute's plain text). When interpretive aids are necessary, we

13

should use them; whichever tool will help us get closest to the meaning of the legislative text, that is the tool we should use. But sometimes, such as here, we need only our "ordinary understanding of how English works" to decide a case.  See Lockhart, 136 S. Ct. at 969 (Kagan, J., dissenting).

C

¶83  No special tools are necessary to understand the plain text of § 252.03, which clearly and unambiguously authorizes "all measures necessary to prevent, suppress[,] and control communicable diseases." Cf. Peters, 263 Wis. 2d 475, ¶14.  On its face, nowhere does § 252.03 prevents local health officers from closing schools.  The majority offers no persuasive statutory analysis for why we should interpret the legislative text contrary to its plain meaning.  So long as it is reasonable or necessary for local health officers to close schools to prevent and suppress disease, nothing in the plain text of § 252.03, its background, or the relevant statutory context prevents them from doing so.

III

¶84  Even though the majority resolves the case on statutory grounds, it bulldozes its way through an unnecessary constitutional analysis.  It is well settled that we should avoid constitutional questions when we can resolve the case on statutory grounds.  The majority offers no legal basis for deviating from that practice here.  Thus, the majority's analysis of the petitioners' free-exercise-of-religion claim is wholly beside the point.

¶85  This court has stated time and again that it decides cases on the narrowest available grounds.  See, e.g., Voters with

14

Facts v. City of Eau Claire, 2018 WI 63, ¶26, 382 Wis. 2d 1, 913 N.W.2d 131. When a party raises both a statutory and a constitutional challenge, as is the case here, we should attempt to interpret the challenged statute in a way that both resolves the case and avoids the constitutional question.[4] Milwaukee Branch of the NAACP v. Walker, 2014 WI 98, ¶64, 357 Wis. 2d 469, 851 N.W.2d 262. That approach is known as the doctrine of constitutional avoidance, under which we generally reach constitutional claims only if the case is "incapable of resolution without deciding the constitutional conflict." Gabler v. Crime Victims Rts. Bd., 2017 WI 67, ¶¶51-52, 376 Wis. 2d 147, 897 N.W.2d 384; Kollasch v. Adamany, 104 Wis. 2d 552, 561, 313 N.W.2d 47 (1981).

¶86 The reason our precedent so strongly discourages reaching unnecessary constitutional questions is that we have no established method for deciding when to do so. For example, there is no objective test for what constitutes a constitutional issue of great public importance. In fact, one could reasonably argue that nearly every case with a constitutional dimension raises such an issue. And the majority offers no explanation for why this particular constitutional question, about an expired local health order that applies to just one of Wisconsin's 72 counties, is of any greater public import than any other claim involving an alleged violation of individual liberties. See, e.g., Kollasch, 104 Wis. 2d at 561. Such a malleable exception all but abandons what

---

[4] Indeed, the same rationale the majority offers for declining to address the petitioners' other constitutional claims applies with equal force to their free-exercise claim. See majority op., ¶13 n.9.

has been this court's "[s]ound judicial policy" for over 100 years: avoiding constitutional questions unless answering them is "essential" to deciding the case. See, e.g., State ex rel. Rosenhein v. Frear, 138 Wis. 173, 176, 119 N.W. 894 (1909); Smith v. Journal Co., 271 Wis. 384, 390, 73 N.W.2d 429 (1955); Kollasch, 104 Wis. 2d at 554; Adams Outdoor Advert., Ltd. v. City of Madison, 2006 WI 104, ¶91, 294 Wis. 2d 441, 717 N.W.2d 803; State v. Scott, 2018 WI 74, ¶12, 382 Wis. 2d 476, 914, N.W.2d 141. At its core, "the doctrine of constitutional avoidance requires that we act with restraint." Tetra Tech EC, Inc. v. DOR, 2018 WI 75, ¶138, 382 Wis. 2d 496, 914 N.W.2d 21(Ziegler, J., concurring).

¶87 The majority acts with anything but. Its tortured statutory interpretation fully resolves this case; yet it barrels its way to a constitutional challenge no longer in play. The majority makes no claim that this case is incapable of being resolved on statutory grounds. Cf. Gabler, 376 Wis. 2d 147, ¶51. Nor could it, having already resolved the case on statutory grounds. See Labor & Farm Party v. Wis. Elections Bd., 117 Wis. 2d 351, 354, 344 N.W.2d 177 (refusing to address "various constitutional issues" because the court resolved the case "on statutory construction grounds alone"). Rather, the majority opinion "reaches for the constitution unnecessarily," exemplifying the antithesis of judicial restraint. See Tetra Tech EC, 382 Wis. 2d 496, ¶138 (Ziegler, J., concurring); Wis. Legislature v. Palm, 2020 WI 42, ¶168, 391 Wis. 2d 497, 942 N.W.2d 900 (Hagedorn, J., dissenting) (explaining that the court's proper role is not "to do freewheeling constitutional theory" or "to decide every

16

interesting legal question" but to "precise[ly]" and "carefully focus[]" on the narrow . . . question[]" before it).

¶88 Furthermore, the facts here counsel strongly against reaching the constitutional question. Section 8 of the Order explicitly exempts religious practices from its in-person gathering restrictions: "[r]eligious entities <u>are exempt</u> from mass gathering requirements for religious services <u>and religious practices</u>" (emphases added). The majority makes no mention of that provision——possibly because it torpedoes the majority's constitutional analysis. If in-person education on every subject, religious or not, is truly religious practice, as some petitioners here claim, nothing in the Order burdens that practice. But regardless of the constitutional question presented, there is no need to reach it.

IV

¶89 The plain text of Wis. Stat. § 252.03 contains no indication that closing schools falls outside of local health officers' directives to "take all measures necessary to prevent, suppress[,] and control communicable diseases," and to do what is "reasonable and necessary for the prevention and suppression of disease." Nothing about DHS's directive under § 252.02 suggests otherwise. The majority reaches a contrary interpretation through an unnecessary reliance on, and misuse of, tools for interpreting ambiguous statutes. That erroneous interpretation fully resolves this case, obviating any reason to reach the constitutional question. Thus, for the foregoing reasons, I respectfully dissent.

¶90 I am authorized to state that Justices ANN WALSH BRADLEY and JILL J. KAROFSKY join this dissent.